# UNITED STATES *v.* HATTER, JUDGE, UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, ET AL.

No. 99–1978.   Argued February 20, 2001—Decided May 21, 2001

558

560

*Paul R. Q. Wolfson* argued the cause for the United States. With him on the briefs were *Acting Solicitor General Underwood,* former *Solicitor General Waxman, Assistant Attorney General Ogden, Deputy Solicitor General Kneedler, David M. Cohen, Douglas N. Letter,* and *Anne Murphy.*

*Steven S. Rosenthal* argued the cause for respondents. With him on the brief were *W. Stephen Smith* and *Ellen E. Deason.**

JUSTICE BREYER delivered the opinion of the Court.

The Constitution's Compensation Clause guarantees federal judges a "Compensation, which shall not be diminished during their Continuance in Office." U. S. Const., Art. III, § 1. The Court of Appeals for the Federal Circuit held that this Clause prevents the Government from collecting certain

---

*Briefs of *amici curiae* urging affirmance were filed for the Federal Judges Association by *Kevin M. Forde* and *Richard J. Prendergast;* and for the Los Angeles County Bar Association et al. by *Mark E. Haddad, Catherine V. Barrad, Paul J. Watford, Richard Walch, Evan A. Davis, Amitai Schwartz, Steven F. Pflaum, Richard William Austin, Barbara J. Collins, Dennis F. Kerrigan, Jr., P. Kevin Castel, Herbert H. Franks, Dennis A. Rendelman,* and *John J. Kenney.*

Medicare and Social Security taxes from a small number of federal judges who held office nearly 20 years ago—before Congress extended the taxes to federal employees in the early 1980's.

In our view, the Clause does not prevent Congress from imposing a "non-discriminatory tax laid generally" upon judges and other citizens, *O'Malley* v. *Woodrough*, 307 U. S. 277, 282 (1939), but it does prohibit taxation that singles out judges for specially unfavorable treatment. Consequently, unlike the Court of Appeals, we conclude that Congress may apply the Medicare tax—a nondiscriminatory tax—to then-sitting federal judges. The special retroactivity-related Social Security rules that Congress enacted in 1984, however, effectively singled out then-sitting federal judges for unfavorable treatment. Hence, like the Court of Appeals, we conclude that the Clause forbids the application of the Social Security tax to those judges.

## I

### A

The Medicare law before us is straightforward. In 1965, Congress created a Federal Medicare "hospital insurance" program and tied its financing to Social Security. See Social Security Amendments of 1965, 79 Stat. 291. The Medicare law required most American workers (whom Social Security covered) to pay an additional Medicare tax. But it did not require Federal Government employees (whom Social Security did not cover) to pay that tax. See 26 U. S. C. §§ 3121(b)(5), (6) (1982 ed.).

In 1982, Congress, believing that "[f]ederal workers should bear a more equitable share of the costs of financing the benefits to which many of them eventually became entitled," S. Rep. No. 97–494, pt. 1, p. 378 (1982), extended both Medicare eligibility and Medicare taxes to all currently employed federal employees as well as to all newly hired federal employees, Tax Equity and Fiscal Responsibility Act of 1982,

§ 278, 96 Stat. 559–563.   That new law meant that (as of January 1, 1983) all federal judges, like all other federal employees and most other citizens, would have to contribute between 1.30% and 1.45% of their federal salaries to Medicare's hospital insurance system.   See 26 U. S. C. §§ 3101(b)(4)–(6).

The Social Security law before us is more complex.   In 1935, Congress created the Social Security program.   See Social Security Act, 49 Stat. 620.   For nearly 50 years, that program covered employees in the private sector, but it did not cover Government employees.   See 26 U. S. C. §§ 3121(b)(5), (6) (1982 ed.) (excluding federal employees); § 3121(b)(7) (excluding state employees).   In 1981, a National Commission on Social Security Reform, convened by the President and chaired by Alan Greenspan, noting the need for "action . . . to strengthen the financial status" of Social Security, recommended that Congress extend the program to cover Federal, but not state or local, Government employees. Report of the National Commission on Social Security Reform 2–1, 2–7 (Jan. 1983).   In particular, the Commission recommended that Congress *require* all incoming federal employees (those hired after January 1, 1984) to enter the Social Security system and to pay Social Security taxes.   *Id.*, at 2–7.   The Commission emphasized that "present Federal employees will *not* be affected by this recommendation." *Id.*, at 2–8.

In 1983, Congress enacted the Commission's recommendation into law (effective January 1, 1984) with an important exception.   See Social Security Amendments of 1983, § 101(b)(1), 97 Stat. 69 (amending 26 U. S. C. §§ 3121(b)(5), (6)).   As the Commission had recommended, Congress *required* all newly hired federal employees to participate in the Social Security program.   It also *permitted,* without requiring, almost all (about 96%) then-currently employed federal employees to participate.

Contrary to the Commission's recommendation, however, the law added an exception.   That exception seemed to re-

strict the freedom of choice of the remaining 4% of all current employees. This class consisted of the President, Vice President, high-level Executive Branch employees, Members of Congress, a few other Legislative Branch employees, and all federal judges. See 42 U. S. C. §§ 410(a)(5)(C)–(G); see also H. R. Rep. No. 98–25, p. 39 (1983); H. R. Conf. Rep. No. 98–542, p. 13 (1983) (noting that for these current federal employees "the rules are being changed in the middle of the game"). The new law seemed to *require* this class of current federal employees to enter into the Social Security program, see 42 U. S. C. §§ 410(a)(5)(C)–(G). But, as to almost all of these employees, the new law imposed no additional financial obligation or burden.

That is because the new law then created an exception to the exception, see Federal Employees' Retirement Contribution Temporary Adjustment Act of 1983, §§ 203(a)(2), 208, 97 Stat. 1107, 1111 (codified at note following 5 U. S. C. § 8331). The exception to the exception said that any member of this small class of current high-level officials (4% of all then-current employees) who contributed to a "covered" retirement program nonetheless could choose to modify their participation in a manner that left their total payroll deduction—for retirement and Social Security—unchanged. A "covered" employee paying 7% of salary to a "covered" program could continue to pay that 7% and no more, in effect avoiding any additional financial obligation as a result of joining Social Security.

The exception to the exception defined a "covered" program to include the Civil Service Retirement and Disability System—a program long available to almost all federal employees—as well as any other retirement system to which an employee must contribute. §§ 203(a)(2)(A), (D). The definition of "covered" program, however, did not encompass the pension system for federal judges—a system that is noncontributory in respect to a judge (but contributory in respect to a spouse).

The upshot is that the 1983 law was specifically aimed at extending Social Security to federal employees. It left about 96% of those who were currently employed free to choose not to participate in Social Security, thereby avoiding any increased financial obligation. It required the remaining 4% to participate in Social Security while freeing them of any added financial obligation (or additional payroll deduction) so long as they previously had participated in other contributory retirement programs. But it left those who could not participate in a contributory program without a choice. Their financial obligations (and payroll deductions) had to increase. And this last mentioned group consisted almost exclusively of federal judges.

### B

This litigation began in 1989, when eight federal judges, all appointed before 1983, sued the Government for "compensation" in the United States Claims Court. They argued that the 1983 law, in requiring them to pay Social Security taxes, violated the Compensation Clause. Initially, the Claims Court ruled against the judges on jurisdictional grounds. 21 Cl. Ct. 786 (1990). The Court of Appeals reversed. 953 F. 2d 626 (CA Fed. 1992). On remand, eight more judges joined the lawsuit. They contested the extension to judges of the Medicare tax as well.

The Court of Federal Claims held against the judges on the merits. 31 Fed. Cl. 436 (1994). The Federal Circuit reversed, ordering summary judgment for the judges as to liability. 64 F. 3d 647 (1995). The Government petitioned this Court for a writ of certiorari. Some Members of this Court were disqualified from hearing the matter, and we failed to find a quorum of six Justices. See 28 U. S. C. § 1. Consequently, the Court of Appeals' judgment was affirmed "with the same effect as upon affirmance by an equally divided court." 519 U. S. 801 (1996); see 28 U. S. C. § 2109.

On remand from the Court of Appeals, the Court of Federal Claims found (a) that the 6-year statute of limitations, see 28 U. S. C. §§ 2401(a), 2501, barred some claims, including all Medicare claims; and (b) that, in any event, a subsequently enacted judicial salary increase promptly cured any violation, making damages minimal. 38 Fed. Cl. 166 (1997). The Court of Appeals (eventually en banc) reversed both determinations. 203 F. 3d 795 (CA Fed. 2000).

The Government again petitioned for certiorari. It asked this Court to consider two questions:

(1) Whether Congress violated the Compensation Clause when it extended the Medicare and Social Security taxes to the salaries of sitting federal judges; and

(2) If so, whether any such violation ended when Congress subsequently increased the salaries of all federal judges by an amount greater than the new taxes.

Given the specific statutory provisions at issue and the passage of time, seven Members of this Court had (and now have) no financial stake in the outcome of this case. Consequently a quorum was, and is, available to consider the questions presented. And we granted the Government's petition for a writ of certiorari.

## II

At the outset, the judges claim that the "law of the case" doctrine prevents us from now considering the first question presented, namely, the scope of the Compensation Clause. They note that the Government presented that same question in its petition from the Court of Appeals' earlier ruling on liability. They point out that our earlier denial of that petition for lack of a quorum had the "same effect as" an "affirmance by an equally divided court," 28 U. S. C. § 2109. And they add that this Court has said that an affirmance by an equally divided Court is "conclusive and binding upon the parties as respects that controversy." *United States* v. *Pink*, 315 U. S. 203, 216 (1942).

*Pink,* however, concerned a case, *United States* v. *Moscow Fire Ins. Co.,* 309 U. S. 624 (1940), in which this Court had heard oral argument and apparently considered the merits prior to concluding that affirmance by an equally divided Court was appropriate. The law of the case doctrine presumes a hearing on the merits. See, *e. g., Quern* v. *Jordan,* 440 U. S. 332, 347, n. 18 (1979). This case does not involve a previous consideration of the merits. Indeed, when this case previously was before us, due to absence of a quorum, we could not consider either the merits or whether to consider those merits through grant of a writ of certiorari. This fact, along with the obvious difficulty of finding other equivalent substitute forums, convinces us that *Pink's* statement does not control the outcome here, that the "law of the case" doctrine does not prevent our considering both issues presented, and that we should now proceed to decide them.

## III

The Court of Appeals upheld the judges' claim of tax immunity upon the authority of *Evans* v. *Gore,* 253 U. S. 245 (1920). That case arose in 1919 when Judge Walter Evans challenged Congress' authority to include sitting federal judges within the scope of a federal income tax law that the Sixteenth Amendment had authorized a few years earlier. See Revenue Act of 1918, § 213, 40 Stat. 1065 (defining "gross income" to include judicial salaries). In *Evans* itself, the Court held that the Compensation Clause barred application of the tax to Evans, who had been appointed a judge before Congress enacted the tax. 253 U. S., at 264. A few years later, the Court extended *Evans,* making clear that its rationale covered not only judges appointed before Congress enacted a tax but also judges whose appointments took place after the tax had become law. See *Miles* v. *Graham,* 268 U. S. 501, 509 (1925).

Fourteen years after deciding *Miles,* this Court overruled *Miles. O'Malley* v. *Woodrough,* 307 U. S. 277 (1939). But,

as the Court of Appeals noted, this Court did not expressly overrule *Evans* itself. 64 F. 3d, at 650. The Court of Appeals added that, if "changes in judicial doctrine" had significantly undermined *Evans'* holding, this "Court itself would have overruled the case." *Ibid.* Noting that this case is like *Evans* (involving judges appointed *before* enactment of the tax), not like *O'Malley* (involving judges appointed *after* enactment of the tax), the Court of Appeals held that *Evans* controlled the outcome. 64 F. 3d, at 650. Hence application of both Medicare and Social Security taxes to these preenactment judges violated the Compensation Clause.

The Court of Appeals was correct in applying *Evans* to the instant case, given that "it is this Court's prerogative alone to overrule one of its precedents." *State Oil Co.* v. *Khan,* 522 U. S. 3, 20 (1997); see also *Rodriguez de Quijas* v. *Shearson/American Express, Inc.,* 490 U. S. 477, 484 (1989). Nonetheless, the court below, in effect, has invited us to reconsider *Evans.* We now overrule *Evans* insofar as it holds that the Compensation Clause forbids Congress to apply a generally applicable, nondiscriminatory tax to the salaries of federal judges, whether or not they were appointed before enactment of the tax.

The Court's opinion in *Evans* began by explaining why the Compensation Clause is constitutionally important, and we begin by reaffirming that explanation. As *Evans* points out, 253 U. S., at 251–252, the Compensation Clause, along with the Clause securing federal judges appointments "during good Behavior," U. S. Const., Art. III, § 1—the practical equivalent of life tenure—helps to guarantee what Alexander Hamilton called the "complete independence of the courts of justice." The Federalist No. 78, p. 466 (C. Rossiter ed. 1961). Hamilton thought these guarantees necessary because the Judiciary is "beyond comparison the weakest of the three" branches of Government. *Id.,* at 465–466. It has "no influence over either the sword or the purse." *Id.,* at 465.

It has "no direction either of the strength or of the wealth of the society." *Ibid.* It has "neither FORCE nor WILL but merely judgment." *Ibid.*

Hamilton's view, and that of many other Founders, was informed by firsthand experience of the harmful consequences brought about when a King of England "made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries." The Declaration of Independence ¶ 11. And Hamilton knew that *"a power over a man's subsistence amounts to a power over his will."* The Federalist No. 79, at 472. For this reason, he observed, "[n]ext to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support." *Ibid.;* see also *id.,* No. 48, at 310 (J. Madison) ("[A]s the legislative department alone has access to the pockets of the people, and has . . . full discretion . . . over the pecuniary rewards of those who fill the other departments, a dependence is thus created in the latter, which gives still greater facility to encroachments of the former").

*Evans* properly added that these guarantees of compensation and life tenure exist, "not to benefit the judges," but "as a limitation imposed in the public interest." 253 U. S., at 253. They "promote the public weal," *id.,* at 248, in part by helping to induce "learned" men and women "to quit the lucrative pursuits" of the private sector, 1 J. Kent, Commentaries on American Law *294, but more importantly by helping to secure an independence of mind and spirit necessary if judges are "to maintain that nice adjustment between individual rights and governmental powers which constitutes political liberty," W. Wilson, Constitutional Government in the United States 143 (1911).

Chief Justice John Marshall pointed out why this protection is important. A judge may have to decide "between the Government and the man whom that Government is prosecuting: between the most powerful individual in the

community, and the poorest and most unpopular." Proceedings and Debates of the Virginia State Convention, of 1829–1830, p. 616 (1830). A judge's decision may affect an individual's "property, his reputation, his life, his all." *Ibid.* In the "exercise of these duties," the judge must "observe the utmost fairness." *Ibid.* The judge must be "perfectly and completely independent, with nothing to influence or contro[l] him but God and his conscience." *Ibid.* The "greatest scourge . . . ever inflicted," Marshall thought, "was an ignorant, a corrupt, or a dependent Judiciary." *Id.,* at 619.

Those who founded the Republic recognized the importance of these constitutional principles. See, *e. g.,* Wilson, Lectures on Law (1791), in 1 Works of James Wilson 363 (J. Andrews ed. 1896) (stating that judges should be "completely independent" in "their salaries, and in their offices"); McKean, Debate in Pennsylvania Ratifying Convention, Dec. 11, 1787, in 2 Debates on the Federal Constitution 539 (J. Elliot ed. 1836) (the security of undiminished compensation disposes judges to be "more easy and independent"); see also 1 Kent, *supra,* at \*294 ("[P]ermanent support" and the "tenure of their office" "is well calculated . . . to give [judges] the requisite independence"). They are no less important today than in earlier times. And the fact that we overrule *Evans* does not, in our view, diminish their importance.

We also agree with *Evans* insofar as it holds that the Compensation Clause offers protections that extend beyond a legislative effort directly to diminish a judge's pay, say, by ordering a lower salary. 253 U. S., at 254. Otherwise a legislature could circumvent even the most basic Compensation Clause protection by enacting a discriminatory tax law, for example, that precisely but indirectly achieved the forbidden effect.

Nonetheless, we disagree with *Evans'* application of Compensation Clause principles to the matter before it—a nondiscriminatory tax that treated judges the same way it treated other citizens. *Evans'* basic holding was that the

Compensation Clause forbids such a tax because the Clause forbids "all diminution," including "taxation," "whether for one purpose or another." *Id.*, at 255. The Federal Circuit relied upon this holding. 64 F. 3d, at 650. But, in our view, it is no longer sound law.

For one thing, the dissenters in *Evans* cast the majority's reasoning into doubt. Justice Holmes, joined by Justice Brandeis, wrote that the Compensation Clause offers "no reason for exonerating" a judge "from the ordinary duties of a citizen, which he shares with all others. To require a man to pay the taxes that all other men have to pay cannot possibly be made an instrument to attack his independence as a judge." 253 U. S., at 265. Holmes analogized the "diminution" that a tax might bring about to the burden that a state law might impose upon interstate commerce. If "there was no discrimination against such commerce the tax constituted one of the ordinary burdens of government from which parties were not exempted." *Id.*, at 267.

For another thing, this Court's subsequent law repudiated *Evans'* reasoning. In 1939, 14 years after *Miles* extended *Evans'* tax immunity to judges appointed after enactment of the tax, this Court retreated from that extension. See *O'Malley*, 307 U. S., at 283 (overruling *Miles*). And in so doing the Court, in an opinion announced by Justice Frankfurter, adopted the reasoning of the *Evans* dissent. The Court said that the question was whether judges are immune "from the incidences of taxation to which everyone else within the defined classes . . . is subjected." 307 U. S., at 282. Holding that judges are not "immun[e] from sharing with their fellow citizens the material burden of the government," *ibid.*, the Court pointed out that the legal profession had criticized *Evans'* contrary conclusion, and that courts outside the United States had resolved similar matters differently, 307 U. S., at 281. And the Court concluded that "a non-discriminatory tax laid generally on net income is not, when applied to the income of a federal judge, a diminution

of his salary within the prohibition of Article III." *Id.*, at 282. The Court conceded that *Miles* had reached the opposite conclusion, but it said that *Miles* "cannot survive." 307 U. S., at 283. Still later, this Court noted that "[b]ecause *Miles* relied on *Evans* v. *Gore, O'Malley* must also be read to undermine the reasoning of *Evans.*" *United States* v. *Will,* 449 U. S. 200, 227, n. 31 (1980).

Finally, and most importantly, we believe that the reasoning of Justices Holmes and Brandeis, and of this Court in *O'Malley,* is correct. There is no good reason why a judge should not share the tax burdens borne by all citizens. We concede that this Court has held that the Legislature cannot *directly* reduce judicial salaries even as part of an equitable effort to reduce *all* Government salaries. See 449 U. S., at 226. But a tax law, unlike a law mandating a salary reduction, affects compensation indirectly, not directly. See *ibid.* (distinguishing between measures that directly and those that indirectly diminish judicial compensation). And those prophylactic considerations that may justify an absolute rule forbidding direct salary reductions are absent here, where indirect taxation is at issue. In practice, the likelihood that a nondiscriminatory tax represents a disguised legislative effort to influence the judicial will is virtually nonexistent. Hence, the potential threats to judicial independence that underlie the Constitution's compensation guarantee cannot justify a special judicial exemption from a commonly shared tax, not even as a preventive measure to counter those threats.

For these reasons, we hold that the Compensation Clause does not forbid Congress to enact a law imposing a nondiscriminatory tax (including an increase in rates or a change in conditions) upon judges, whether those judges were appointed before or after the tax law in question was enacted or took effect. Insofar as *Evans* holds to the contrary, that case, in *O'Malley*'s words, "cannot survive." 307 U. S., at 283.

The Government points out that the Medicare tax is just such a nondiscriminatory tax. Neither the courts below, nor the federal judges here, argue to the contrary. Hence, insofar as the Court of Appeals found that application of the Medicare tax law to federal judges is unconstitutional, we reverse its decision.

## IV

The Social Security tax is a different matter. Respondents argue that the 1983 law imposing that tax upon then-sitting judges violates the Compensation Clause, for it discriminates against judges in a manner forbidden by the Clause, even as interpreted in *O'Malley*, not *Evans*. Cf. *O'Malley, supra,* at 282 (stating question as whether judges are immune "from the incidences of taxation *to which everyone else within the defined classes* . . . is subjected" (emphasis added)). After examining the statute's details, we agree with the judges that it does discriminate in a manner that the Clause forbids. Four features of the law, taken together, lead us to this conclusion.

First, federal employees had remained outside the Social Security system for nearly 50 years prior to the passage of the 1983 law. Congress enacted the law pursuant to the Social Security Commission's recommendation to bring those employees within the law. See *supra,* at 562. And the law itself deals primarily with that subject. Thus, history, context, statutory purpose, and statutory language, taken together, indicate that the category of "federal employees" is the appropriate class against which we must measure the asserted discrimination.

Second, the law, as applied in practice, in effect imposed a new financial obligation upon sitting judges, but it did not impose a new financial burden upon any other group of (then) current federal employees. We have previously explained why that is so. See *supra,* at 562–564. The law required all newly hired federal employees to join Social Security and pay related taxes. It gave 96% of all current employees

(employed as of January 1, 1984, or earlier) total freedom to enter, or not to enter, the system as they chose. It gave the remaining 4% of all current employees the freedom to maintain their pre-1984 payroll deductions, provided that they were currently enrolled in a "covered" system. And it defined "covered" system in a way that included virtually all of that 4%, except for federal judges. See *supra,* at 563–564. The practical upshot is that the law permitted nearly every current federal employee, but not federal judges, to avoid the newly imposed financial obligation.

Third, the law, by including sitting judges in the system, adversely affected most of them. Inclusion meant a requirement to pay a tax of about $2,000 per year, deducted from a monthly salary check. App. 49. At the same time, 95% of the then-active judges had already qualified for Social Security (due to private sector employment) before becoming judges. See *id.,* at 115. And participation in Social Security as judges would benefit only a minority. See *id.,* at 116–119 (reviewing examples of individual judges and demonstrating that participation in Social Security primarily would benefit the minority of judges who had not worked the 40 quarters necessary to be fully insured). The new law imposed a substantial cost on federal judges with little or no expectation of substantial benefit for most of them.

Fourth, when measured against Compensation Clause objectives, the Government's justification for the statutory distinction (between judges, who do, and other federal employees, who do not, incur additional financial obligations) is unsound. The sole justification, according to the Government, is one of "equaliz[ing]" the retirement-related obligations that pre-1983 law imposed upon judges with the retirement-related obligations that pre-1983 law imposed upon other current high-level federal employees. Brief for United States 40. Thus the Government says that the new financial burden imposed upon judges was meant to make up for the fact that the judicial retirement system is basically

a noncontributory system, while the system to which other federal employees belonged was a contributory system. *Id.*, at 39–40; Reply Brief for United States 16.

This rationale, however, is the Government's and not necessarily that of Congress, which was silent on the matter. Cf. *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 50 (1983) (expressing concern at crediting *post hoc* explanation of agency action).

More importantly, the judicial retirement system is noncontributory because it reflects the fact that the Constitution itself guarantees federal judges life tenure—thereby constitutionally permitting federal judges to draw a salary for life simply by continuing to serve. Cf. *Booth* v. *United States*, 291 U. S. 339, 352 (1934) (holding that Compensation Clause protects salary of judge who has retired). That fact means that a contributory system, in all likelihood, would not work. And, of course, as of 1982, the noncontributory pension salary benefits were themselves part of the judge's compensation. The 1983 statute consequently singles out judges for adverse treatment solely because of a feature required by the Constitution to preserve judicial independence. At the same time, the "equaliz[ation]" in question takes place not by offering all current federal employees (including judges) the same opportunities but by employing a statutory disadvantage which offsets a constitutionally guaranteed advantage. Hence, to accept the "justification" offered here is to permit, through similar reasoning, taxes which have the effect of weakening or eliminating those constitutional guarantees necessary to secure judicial independence, at least insofar as similar guarantees are not enjoyed by others. This point would be obvious were Congress, say, to deny some of the benefits of a tax reduction to those with constitutionally guaranteed life tenure to make up for the fact that other employees lack such tenure. Although the relationships

here—among advantages and disadvantages—are less distant and more complex, the principle is similar.

Nor does the statute "equaliz[e]" with any precision. On the one hand, the then-current retirement system open to all federal employees except judges required a typical employee to contribute 7% to 8% of his or her annual salary. See generally 5 U. S. C. § 8334(a)(1). In return it provided a Member of Congress, for instance, with a pension that vested after five years and increased in value (by 2.5% of the Member's average salary) with each year of service to a maximum of 80% of salary, and covered both employee and survivors. See 5 U. S. C. §§ 8339, 8341. On the other hand, the judges' retirement system (based on life tenure) required no contribution for a judge who retired at age 65 (and who met certain service requirements) to receive full salary. But the right to receive that salary did not vest until retirement. The system provided nothing for a judge who left office before age 65. Nor did the law provide any coverage for a judge's survivors. Indeed, in 1984, a judge had to contribute 4.5% of annual salary to obtain a survivor's annuity, which increased in value by 1.25% of the judge's salary per year to a maximum of 40% of salary. 28 U. S. C. §§ 376(b), (l) (1982 ed.).

These two systems were not equal either before or after Congress enacted the 1983 law. Before 1983, a typical married federal employee other than a judge had to contribute 7% to 8% of annual salary to receive benefits that were better in some respects (vesting period, spousal benefit) and worse in some respects (80% salary maximum) than his married judicial counterpart would receive in return for a 4.5% contribution. The 1983 law imposed an added 5.7% burden upon the judge, in return for which the typical judge received little, or no, financial benefit. Viewed purely in financial equalization terms, and as applied to typical judges, the new requirement seems to overequalize, putting the typical married judge at a financial disadvantage—though

perhaps it would produce greater equality when applied to other, less typical examples.

Taken together, these four characteristics reveal a law that is special—in its manner of singling out judges for disadvantageous treatment, in its justification as necessary to offset advantages related to constitutionally protected features of the judicial office, and in the degree of permissible legislative discretion that would have to underlie any determination that the legislation has "equalized" rather than gone too far. For these reasons the law before us is very different from the "non-discriminatory" tax that *O'Malley* upheld. 307 U. S., at 282. Were the Compensation Clause to permit Congress to enact a discriminatory law with these features, it would authorize the Legislature to diminish, or to equalize away, those very characteristics of the Judicial Branch that Article III guarantees—characteristics which, as we have said, see *supra*, at 568–569, the public needs to secure that judicial independence upon which its rights depend. We consequently conclude that the 1983 Social Security tax law discriminates against the Judicial Branch, in violation of the Compensation Clause.

The Government makes additional arguments in support of reversal. But we find them unconvincing. It suggests that Article III protects judges only against a reduction in stated salary, not against indirect measures that only reduce take-home pay. Brief for United States 28. In *O'Malley*, however, this Court, when upholding a "non-discriminatory" tax, strongly implied that the Compensation Clause would bar a discriminatory tax. 307 U. S., at 282. The commentators whose work *O'Malley* cited said so explicitly. See Fellman, The Diminution of Judicial Salaries, 24 Iowa L. Rev. 89, 99 (1938); see also Comment, 20 Ill. L. Rev. 376, 377 (1925); Corwin, Constitutional Law in 1919–1920, 14 Am. Pol. Sci. Rev. 635, 642 (1920). And in *Will*, the Court yet more strongly indicated that the Compensation Clause bars indirect efforts to reduce judges' salaries through taxes when

those taxes discriminate. 449 U. S., at 226. Indeed, the Government itself "assume[s] that discriminatory taxation of judges would contravene fundamental principles underlying Article III, if not the [Compensation] Clause itself." Brief for United States 37, n. 27.

The Government also argues that there is no evidence here that Congress singled out judges for special treatment in order to intimidate, influence, or punish them. But this Court has never insisted upon such evidence. To require it is to invite legislative efforts that embody, but lack evidence of, some such intent, engendering suspicion among the branches and consequently undermining that mutual respect that the Constitution demands. Cf. Wilson, Lectures on Law, in 1 Works of James Wilson, at 364 (stating that judges "should be removed from the most distant apprehension of being affected, in their judicial character and capacity, by anything, except their own behavior and its consequences"). Nothing in the record discloses anything other than benign congressional motives. If the Compensation Clause is to offer meaningful protection, however, we cannot limit that protection to instances in which the Legislature manifests, say, direct hostility to the Judiciary.

Finally, the Government correctly points out that the law disfavored not only judges but also the President of the United States and certain Legislative Branch employees. As far as we can determine, however, all Legislative Branch employees were free to join a covered system, and the record provides us with no example of any current Legislative Branch employee who had failed to do so. See Tr. of Oral Arg. 16–17, 37–38. The President's pension is noncontributory. See note following 3 U. S. C. § 102. And the President himself, like the judges, is protected against diminution in his "[c]ompensation." See U. S. Const., Art. II, § 1. These facts may help establish congressional good faith. But, as we have said, we do not doubt that good faith. And we do not see why, otherwise, the separate and special exam-

ple of that single individual, the President, should make a critical difference here.

We conclude that, insofar as the 1983 statute required then-sitting judges to join the Social Security system and pay Social Security taxes, that statute violates the Compensation Clause.

## V

The second question presented is whether the

"constitutional violation ended when Congress increased the statutory salaries of federal judges by an amount greater than the amount [of the Social Security] taxes deducted from respondents' judicial salaries." Pet. for Cert. I.

The Government argues for an affirmative answer. It points to a statutory salary increase that all judges received in 1984. It says that this increase, subsequent to the imposition of Social Security taxes on judges' salaries, cured any earlier unconstitutional diminution of salaries in a lesser amount. Otherwise, if "Congress improperly reduced judges' salaries from $140,000" per year "to $130,000" per year, the judges would be able to collect the amount of the improper reduction, here $10,000, forever—even if Congress cured the improper reduction by raising salaries $20,000, to $150,000, a year later. Reply Brief for United States 18. To avoid this consequence, the Government argues, we should simply look to the fact of a later salary increase "whether or not one of Congress's purposes in increasing the salaries" was "to terminate the constitutional violation." *Ibid.*

But how could we always decide whether a later salary increase terminates a constitutional violation without examining the purpose of that increase? Imagine a violation that affected only a few. To accept the Government's position would leave those few at a permanent salary disadvantage. If, for example, Congress reduced the salaries of one group

of judges by 20%, a later increase of 30% applicable to all judges would leave the first group permanently 20% behind. And a pay cut that left those judges at a permanent disadvantage would perpetuate the very harm that the Compensation Clause seeks to prevent.

The Court of Appeals consequently examined the context in which the later pay increases took place in order to determine their relation to the earlier Compensation Clause violation. It found "nothing to suggest" that the later salary increase at issue here sought "to make whole the losses sustained by the pre-1983 judges." 185 F. 3d, at 1362–1363. The Government presents no evidence to the contrary.

The relevant economic circumstances surrounding the 1984, and subsequent, salary increases include inflation sufficiently serious to erode the real value of judicial salaries and salary increases insufficient to maintain real salaries or real compensation parity with many other private-sector employees. See Report of 1989 Commission on Executive, Legislative, and Judicial Salaries, Hearings before the Senate Committee on Governmental Affairs, 101st Cong., 1st Sess., 12–13 (1989) (testimony of Lloyd Cutler regarding effect of inflation on judges' salaries since 1969). For instance, while consumer prices rose 363% between 1969 and 1999, salaries in the private sector rose 421%, and salaries for district judges rose 253%. See American Bar Association, Federal Judicial Pay Erosion 11 (Feb. 2001). These figures strongly suggest that the judicial salary increases simply reflected a congressional effort to restore both to judges and to Members of Congress themselves some, but not all, of the real compensation that inflation had eroded. Those salary increases amounted to a congressional effort to adjust judicial salaries to reflect "fluctuations in the value of money," The Federalist No. 79, at 473 (A. Hamilton)—the kind of adjustment that the Founders believed "may be requisite," McKean, Debate in Pennsylvania Ratifying Convention, Dec. 11, 1787, in 2 Debates on the Federal Constitution, at 539; see

also Rosenn, The Constitutional Guaranty Against Diminu-
tion of Judicial Compensation, 24 UCLA L. Rev. 308, 314–
315 (1976).

We have found nothing to the contrary. And we therefore
agree with the Court of Appeals' similar conclusion. 185
F. 3d, at 1363 ("[E]verything in the record" suggests that the
increase was meant to halt "the slide in purchasing power
resulting from continued and unadjusted-for inflation").

The Government says that a circumstance-specific ap-
proach may prove difficult to administer. Brief for United
States 43. And we concede that examining the circum-
stances in order to determine whether there is or is not a
relation between an earlier violation and a later increase is
more complex than the Government's proposed automatic ap-
proach. But we see no reason why such relief as damages or
an exemption from Social Security would prove unworkable.

Finally, the Government looks to our decision in *Will* for
support. In that case, federal judges challenged the con-
stitutionality of certain legislative "freezes" that Congress
had imposed upon earlier enacted Government-wide cost-of-
living salary adjustments. The Court found a Compensa-
tion Clause violation in respect to the freeze for what was
designated Year One (where Congress had rescinded an ear-
lier voted 4.8% salary increase). *Will*, 449 U. S., at 225–
226. The Government points out that the *Will* Court "noted
that Congress, later in that fiscal year, enacted a statutory
increase in judges' salaries that exceeded the salaries that
judges would have received" without the rescission. Brief
for United States 41. And the Government adds that "it
was unquestioned in *Will*" that the judges could not receive
damages for the time subsequent to this later enactment.
*Id.*, at 41–42.

The *Will* Year One example, however, shows only that, in
the circumstances, and unlike the case before us, the later
salary increase *was* related to the earlier salary diminish-
ment. Regardless, the very fact that the matter was "un-

questioned" in *Will* shows that it was not argued. See 449 U. S., at 206, n. 3 (noting that the judges' complaint sought relief for Year One's diminution only up to the moment of the subsequent salary increase). Hence the Court did not decide the matter now before us.

We conclude that later statutory salary increases did not cure the preceding unconstitutional harm.

## VI

Insofar as the Court of Appeals found the application of Medicare taxes to the salaries of judges taking office before 1983 unconstitutional, its judgment is reversed. Insofar as that court found the application of Social Security taxes to the salaries of judges taking office before 1984 unconstitutional, its judgment is affirmed. We also affirm the Court of Appeals' determination that the 1984 salary increase received by federal judges did not cure the Compensation Clause violation. The case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS and JUSTICE O'CONNOR took no part in the consideration or decision of this case.

JUSTICE SCALIA, concurring in part and dissenting in part.

I agree with the Court that extending the Social Security tax to sitting Article III judges in 1984 violated Article III's Compensation Clause. I part paths with the Court on the issue of extending the Medicare tax to federal judges in 1983, which I think was also unconstitutional.[1]

---

[1] I agree with the Court, see Part II, *ante*, that the law-of-the-case doctrine does not bar our consideration of the merits. I also join the Court in holding, see Part V, *ante*, that any constitutional violation was not remedied by subsequent salary increases.

## I

As an initial matter, I think the Court is right in concluding that *Evans* v. *Gore,* 253 U. S. 245 (1920)—holding that new taxes of general applicability cannot be applied to sitting Article III judges—is no longer good law, and should be overruled. We went out of our way in *O'Malley* v. *Woodrough,* 307 U. S. 277, 280–281 (1939), to catalog criticism of *Evans,* and subsequently recognized, in *United States* v. *Will,* 449 U. S. 200, 227, and n. 31 (1980), that *O'Malley* had "undermine[d] the reasoning of *Evans.*" The Court's decision today simply recognizes what should be obvious: that *Evans* has not only been undermined, but has in fact collapsed.

## II

My disagreement with the Court arises from its focus upon the issue of discrimination, which turns out to be dispositive with respect to the Medicare tax. The Court holds "that the Compensation Clause does not forbid Congress to enact a law imposing a nondiscriminatory tax . . . upon judges, whether those judges were appointed before or after the tax law in question was enacted or took effect." *Ante,* at 571. Since "the Medicare tax is just such a nondiscriminatory tax," the Court concludes that "application of [that] tax law to federal judges is [c]onstitutional." *Ante,* at 572.

But we are dealing here with a "Compensation Clause," not a "Discrimination Clause." See U. S. Const., Art. III, § 1 ("The Judges . . . shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office"). As we have said, "the Constitution makes no exceptions for 'nondiscriminatory' reductions" in judicial compensation, *Will, supra,* at 226. A reduction in compensation is a reduction in compensation, even if all federal employees are subjected to the same cut. The discrimination criterion that the Court uses would make sense if the only purpose of the Compensation Clause were

to prevent invidious (and possibly coercive) action against judges. But as the Court acknowledges, the Clause "'promote[s] the public weal' . . . by helping to induce 'learned' men and women to 'quit the lucrative pursuits' of the private sector," *ante*, at 568 (quoting *Evans, supra*, at 248; 1 J. Kent, Commentaries on American Law *294). That inducement would not exist if Congress could cut judicial salaries so long as it did not do so discriminatorily.

What the question comes down to, then, is (1) whether exemption from a certain tax can constitute part of a judge's "compensation," and (2) if so, whether exemption from the Medicare tax was part of the judges' compensation here. The answer to the more general question seems to me obviously yes. Surely the term "compensation" refers to the entire "package" of benefits—not just cash, but retirement benefits, medical care, *and exemption from taxation if that is part of the employment package.* It is simply unreasonable to think that "$150,000 a year tax-free" (if that was the bargain struck) is not higher compensation than "$150,000 a year subject to taxes." Ask the employees of the World Bank.

The more difficult question—though far from an insoluble one—is *when* an exemption from tax constitutes compensation. In most cases, the presence or absence of taxation upon wages, like the presence or absence of many other factors within the control of government—inflation, for example, or the rates charged by government-owned utilities, or import duties that increase consumer prices—affects the *value* of compensation, but is not an element of compensation itself. The Framers had this distinction well in mind. Hamilton, for example, wrote that as a result of "the fluctuations in the value of money," "[i]t was . . . necessary to leave it to the discretion of the legislature to vary its provisions" for judicial compensation. The Federalist No. 79, p. 473 (C. Rossiter ed. 1961); see also *Will, supra*, at 227 (the Constitution "placed faith in the integrity and sound judgment of the elected representatives to enact increases" in judicial sala-

ries to account for inflation). Since Hamilton thought that the Compensation Clause "put it out of the power of [Congress] to change the condition of the individual [judge] for the worse," The Federalist No. 79, at 473, he obviously believed that inflation does not diminish compensation as that term is used in the Constitution.

This distinction between Government action affecting compensation and Government action affecting the *value* of compensation was the basis for our statement in *O'Malley*, *supra*, at 282, that "[t]o subject [judges] to a general tax is merely to recognize that judges are also citizens, and that their particular function in government does not generate an immunity from sharing with their fellow citizens the material burden of the government . . . ." I agree with the Court, therefore, that *Evans* was wrongly decided—not, however, because in *Evans* there was no discrimination, but because in *Evans* the universal application of the tax *demonstrated* that the Government was not reducing the compensation of its judges but was acting as sovereign rather than employer, imposing a general tax.

But just as it is clear that a federal employee's sharing of a tax-free status that all citizens enjoy is not compensation (and elimination of that tax-free status not a reduction in compensation), so also it is clear that a tax-free status conditioned on federal employment *is* compensation, and its elimination a reduction. The Court apparently acknowledges that if a tax is *imposed* on the basis of federal employment (an income tax, for example, payable only by federal judges) it would constitute a *reduction* in compensation. It is impossible to understand why a tax that is *suspended* on the basis of federal employment (an exemption from federal income tax for federal judges) does not constitute the *conferral* of compensation—in which case its elimination is a *reduction*, whether or not federal judges end up being taxed just like other citizens. Only converting the Compensation

Clause into a Discrimination Clause can explain a contrary conclusion.

And this, of course, is what has been achieved by the targeted extension of the Medicare tax to federal employees who were previously exempt. It may well be that, in some abstract sense, they are not being "discriminated against," since they end up being taxed like other citizens; but this does not alter the fact that, since exemption from the tax was part of their employment package—since they had an employment expectation of a preferential exemption from taxation—their *compensation* was being reduced. One of the benefits of being a federal judge (or any federal employee) had, prior to 1982, been an exemption from the Medicare tax. This benefit Congress took away, much as a private employer might terminate a contractual commitment to pay Medicare taxes on behalf of its employees. The latter would clearly be a cut in compensation, and so is the former.[2] Had Congress simply imposed the Medicare tax on its own employees (including judges) at the time it introduced that tax for other working people, no benefit of federal employment would have been reduced, because, with respect to the newly introduced tax, none had ever existed. But an extension to federal employees of a tax from which they had previously been exempt *by reason of their employment status* seems to me a flat-out reduction of federal employment compensation.

---

[2] As the Court explains, the purpose of the Medicare tax extension was to ensure that federal workers "bear a more equitable share of the costs of financing the benefits to which many of them eventually became entitled" by reason of their own or their spouses' private-sector employment. *Ante*, at 561 (internal quotation marks and citation omitted). As with the Social Security tax, therefore, the Medicare tax aspect of this case does not present the situation in which a tax exemption has been eliminated in return for some other benefit, different in kind but equivalent in value. Cf. *ante*, at 573 ("[P]articipation in Social Security as judges would benefit only a minority").

## III

As should be clear from the above, though I agree with the Court that the extension of the Social Security tax to federal judges runs afoul of the Compensation Clause, I disagree with the Court's grounding of this holding on the discriminatory manner in which the extension occurred. In this part of its opinion, however, the Court's antidiscrimination rationale is slightly different from that which appeared in its discussion of the Medicare tax. There, the focus was on discrimination compared with ordinary citizens; here, the focus is on discrimination vis-à-vis other federal employees. (As the Court explains, federal judges, unlike nearly all other federal employees, were not given the opportunity to opt out of paying the tax.) On my analysis, it would not matter if every federal employee had been made subject to the Social Security tax along with judges, so long as one of the previous entitlements of their federal employment had been exemption from that tax. Federal judges, unlike all other federal employees except the President, see Art. II, § 1, cl. 7, cannot, consistent with the Constitution, have their compensation diminished. If this case involved salary cuts to pay for Social Security, rather than taxes to pay for Social Security, the irrelevance of whether other federal employees were covered by the operative legislation would be clear.

\*     \*     \*

I join in the judgment that extension of the Social Security tax to sitting Article III judges was unconstitutional. I would affirm the Federal Circuit's holding that extension of the Medicare tax was unconstitutional as well.

JUSTICE THOMAS, concurring in the judgment in part and dissenting in part.

I believe this Court was correct in *Evans* v. *Gore*, 253 U. S. 245 (1920), when it held that any tax that reduces a judge's

net compensation violates Article III of the Constitution. Accordingly, I would affirm the judgment of the Court of Appeals in its entirety.