PER CURIAM.
*819 The issue presented on this appeal is whether Civil Service Law § 167(8), as amended, authorizing a reduction of the ***437 State's contribution to health insurance benefits for state employees, including members of the state judiciary, violates the Judicial Compensation Clause of the State Constitution ( N.Y. Const., art. VI, § 25 [a] ). We conclude the State's contribution is not judicial compensation protected from direct diminution by the Compensation Clause, and the reductions in contributions do not have the effect of singling out the judiciary for disadvantageous treatment. Therefore, plaintiffs' constitutional challenge fails.
I. Statutory and Regulatory Background
State employees, including members of the judiciary, are eligible to participate in health insurance plans that are paid, in part, by the State's contributions towards insurance premiums ( Civil Service Law §§ 161, 167 ; see Governor's Mem., Bill Jacket, L. 1956, ch. 461 at 3). Participation is optional and the choice of which *820 **21 insurance to purchase is within the sole discretion of employees.
In 2011, facing a budget crisis, the legislature negotiated with state-employee unions to avoid layoffs in exchange for a percentage reduction to the State's premium contributions, as well as salary freezes and unpaid furloughs. Thereafter, the legislature amended Civil Service Law § 167(8) to authorize the Civil Service Commission to make these reductions for nearly all state employees and retirees. These changes also applied to unrepresented state employees and retirees not involved in negotiations, including approximately 1,200 judges,[1] and over 12,000 "managerial" or "confidential" employees. At the time, the changes did not apply to members of unions who had not agreed to modify their collective bargaining agreement, but those employees were subject to layoffs ( 4 NYCRR 73.12 ).[2] The implementing regulations, effective October 1, 2011, provided for a two to six percentage point reduction in the State's health care contributions, depending on the employee's salary grade ( 4 NYCRR 73.3 [b] ). Judges are not assigned salary grades, but all Supreme Court Justices receive a salary above "salary grade 10," and therefore the State reduced its ***438 premium contribution from 90% to 84% for judges who elect to enroll in the State's health insurance plan, and for judges who retired after January 1, 2012. The regulations also reduced the State's contribution for employees who elected to participate in the state plan and retired between January 1, 1983 and January 1, 2012 from 90% to 88% of the cost of coverage ( 4 NYCRR 73.3 [b] ).
II. Plaintiffs' Action
Plaintiffs are 13 named current and retired Justices of Supreme Court, the Association of Justices of the Supreme Court of the State of New York, and the Supreme Court Justices Association of the City of New York. Plaintiffs filed suit against the State seeking a declaratory judgment that the statute that authorizes the reduction in contributions towards health insurance premiums, Civil Service Law § 167(8), violates the Compensation Clause of the New York State Constitution, and appropriate injunctive relief.
Supreme Court denied the State's motion to dismiss for failure to state a claim pursuant to CPLR 3211(a)(7). On the State's appeal from this interlocutory order, the Appellate Division affirmed, holding that compensation includes health insurance benefits, and that the decrease in the State's contribution level discriminates against judges because, unlike public-sector unionized employees, judges cannot collectively bargain to obtain compensation for the reduction in the State's contributions ( Bransten v. State of New York, 117 A.D.3d 455, 985 N.Y.S.2d 60 [1st Dept.2014] ).
The parties subsequently cross-moved for summary judgment. Supreme Court denied the State's motion and granted the plaintiffs' to the extent of declaring Civil Service Law § 167(8) and its implementing regulations unconstitutional as applied to members of the judiciary ( Bransten v. State of New York, 2015 N.Y. Slip Op. 30422[U], 2015 WL 1331265 [Sup.Ct. N.Y. County 2015] ). The State appealed to this Court as of right directly from Supreme Court's judgment pursuant to CPLR 5601(b)(2).[3]
**22 *821 III. Judicial Compensation Clause Salutary Purpose
Article VI, § 25(a) of the New York State Constitution provides that the compensation of state sitting and retired ***439 judges: "shall be established by law and shall not be diminished during the term of office for which [a judge] was elected or appointed." The term "compensation" is not defined in the Constitution, but its meaning is inextricably tied to the purpose of the Compensation Clause, which is "to promote judicial independence" and, relatedly, to "ensure that the pay of prospective judges, who choose to leave their practices or other legal positions for the bench, will not diminish" (Matter of Maron v. Silver, 14 N.Y.3d 230, 250, 899 N.Y.S.2d 97, 925 N.E.2d 899 [2010], citing United States v. Will, 449 U.S. 200, 221, 101 S.Ct. 471, 66 L.Ed.2d 392 [1980] ).
Historically, the focus of the Compensation Clause has been to protect against the danger of external control over judicial pay as a means by which to exert influence over the judiciary. "[T]he Legislature was precluded from diminishing salaries in recognition of the risk that salary manipulation might be used as a tool to retaliate for unpopular judicial decisions" ( Matter of Maron, 14 N.Y.3d at 252, 899 N.Y.S.2d 97, 925 N.E.2d 899 ). As with the similar prohibition contained in the Federal Compensation Clause, the anti-diminution language was intended to protect judges from the corruptive force of financial uncertainty, in order to maintain an able and independent judiciary, free of coercion from the other branches (see U.S. Const., art. III, § 1 [judges' compensation "shall not be diminished during their Continuance in Office"]; Matter of Maron, 14 N.Y.3d at 250, 899 N.Y.S.2d 97, 925 N.E.2d 899 [purpose of state clause is same as federal clause: to promote judicial independence]; Will, 449 U.S. at 218-220, 101 S.Ct. 471 [framers of Federal Constitution made certain the compensation of judges was protected from one of the evils that brought about the Revolution]; United States v. Hatter, 532 U.S. 557, 568-569, 121 S.Ct. 1782, 149 L.Ed.2d 820 [2001] [founders recognized importance of protecting judiciary from financial dependence on legislature] ).
To that end, and as this Court explained in Matter of Maron, the legislature may not enact laws that directly diminish judicial compensation or accomplish the same result by singling out judges for disadvantageous treatment that indirectly diminishes their pay ( 14 N.Y.3d at 252-254, 899 N.Y.S.2d 97, 925 N.E.2d 899 ; see also Hatter, 532 U.S. at 571, 121 S.Ct. 1782 ). Thus, plaintiffs may establish a Compensation Clause violation here by demonstrating that the State's reduced contribution to their health insurance premiums: (1) is a direct diminishment of their compensation; or (2) is an indirect diminishment that targets judges for disadvantageous treatment.
***440 IV. Prohibition on Direct Diminution in Judicial Compensation
Under our case law, protected judicial "compensation," as that term is used in the Compensation Clause, refers to a judge's salary and any additional monies that serve as a permanent remuneration for costs necessarily incurred in fulfillment *822 **23 of a judge's judicial obligations. So, for example, in People ex rel. Bockes v. Wemple, 115 N.Y. 302, 309-310, 22 N.E. 272 (1889), the Court held that the legislature had increased judicial compensation by providing a fixed amount " 'in lieu' of expenses ... to compensate [the judge] further for what [the] office entailed ... in the way of duties and work." The Court further explained that "the intention of the legislature was to make a permanent addition to the stated salary, which should be beyond the power of subsequent legislatures to affect" ( id. at 310, 22 N.E. 272 ). Similarly, in Gilbert v. Board of Supervisors of County of Kings, 136 N.Y. 180, 185, 32 N.E. 554 (1892), the Court recognized that "the word compensation ... was understood to mean the salary of the judge as such, and the allowance for expenses." Notably, the Court distinguished between compensation within the meaning of the Constitution-what the Court described as the salary set for judges in their role as sitting judges-and a discretionary allowance set by a municipality or board for a judge's local service as a Commissioner of Jurors (see id. at 185-186, 32 N.E. 554 ; see also Bockes at 309-310, 22 N.E. 272 ). From these cases the two essential characteristics of constitutionally-protected judicial compensation can be gleaned: the remunerative purpose and the permanence of the legislative allotment.[4] ***441 The health care contribution at issue here exhibits neither of these characteristics. It is not part of a judicial salary or a permanent remuneration for expenses necessarily incurred in fulfillment of judicial obligations. Nevertheless, plaintiffs argue that compensation means anything of value provided by an employer and includes health care benefits, as they "are an integrated part of the compensation package provided to State employees and Judges." While plaintiffs are correct that the State pays a percentage of premiums for those employees who choose to participate in a state subsidized health care plan, that fact does not transform the State's contribution into judicial compensation within the meaning of our State Constitution. This Court has previously recognized that compensation for constitutional purposes has a unique and historical purpose (see *823 **24 Bockes, 115 N.Y. at 306-307, 22 N.E. 272 ; Gilbert, 136 N.Y. at 184-185, 32 N.E. 554 ).
Indeed, plaintiffs are unable to point to anywhere in the legislative schema where the State's contribution is referred to as "compensation." In fact, chapter 567 of the Laws of 2010, which created the Special Commission on Judicial Compensation, states that the Commission's purpose was to "examine, evaluate and make recommendations with respect to adequate levels of compensation and non-salary benefits for judges and justices of the state-paid courts of the unified court system" (L. 2010, ch. 567, § 1[a] [emphasis added] ). This suggests that, contrary to plaintiffs' argument, judges' health care benefits are distinct from judicial compensation.
Nor does the State's expansion of the class of benefits available to its employees, including judges, provide clear indication that the legislature intended for its contribution towards premiums to be treated as a permanent addition to a judicial salary, whether as part of a judge's pay or as a fixed amount in lieu of expenses. In fact, since the legislature created a centralized state health insurance fund in 1956 (see Civil Service Law § 167 [6 ] ), the State has, on occasion, adjusted the costs and benefits afforded to state employees who have opted into the program by, for example, increasing employees' annual deductibles or changing the amounts employees must pay for out-of-network ***442 services. Notably, the State's contribution to employee health insurance premiums have been changed before, dropping from 100% in 1967 to 90% in 1983 ( Civil Service Law § 167[1][a] ; see also L. 1983, ch. 14). Plaintiffs concede that the State is not required to keep pace with increasing health care costs, which undermines their argument that maintaining the level of state subsidy is necessary to avoid constitutionally impermissible diminution of judicial compensation. Tellingly, "[t]he whole matter" of choosing a health plan-or whether to participate in one at all-is left to the employee (cf. Gilbert, 136 N.Y. at 185, 32 N.E. 554 [additional payment for serving as County Commissioner of Jurors is not compensation for constitutional purposes where the whole matter was left to the discretion of the County's Board of Supervisors] ).
Plaintiffs' approach also lacks a standard by which to distinguish between constitutionally protected compensation and any amount of monies provided directly to judges or as a discount for other costs. For plaintiffs, compensation would include even those items that have an indisputably indirect impact on salary, as, for example, parking privileges, discounts in a cafeteria, or even free coffee and bagels in a communal kitchen. As these examples illustrate, adopting plaintiffs' position renders meaningless "compensation" as a constitutional term of art. It would also leave us without any standard by which to guide future decisions.
Significantly, the challenged percentage reduction in the State's contribution does not jeopardize judicial independence-the essential evil that the Compensation Clause is intended to address (see Matter of Maron, 14 N.Y.3d at 252, 899 N.Y.S.2d 97, 925 N.E.2d 899 ). Granted, health care benefits may be valuable to an employee, but the percentage reduction to the State's contribution is not equivalent to the base salary upon which a judge subsists, and which, if tampered with, "amounts to a power over [a person's] will" ( Will, 449 U.S. at 218, 101 S.Ct. 471 ; Hatter, 532 U.S. at 568, 121 S.Ct. 1782, quoting Alexander Hamilton, Federalist No. 79 at 472 [C. Rossiter ed. 1961]; see also Matter of Maron, 14 N.Y.3d at 252, 899 N.Y.S.2d 97, 925 N.E.2d 899 ).[5] Simply put, the Compensation *824 **25 Clause uses proscriptive language to ensure ***443 that a judge will not hesitate to make a decision for fear that the outcome puts the judge's livelihood in jeopardy.
While the reduction in the State's contributions to the costs of health insurance premiums would increase a participating judge's share of the cost associated with the chosen health care plan, such an increase is not the equivalent of a direct reduction in judicial compensation. It is a cost that is voluntarily assumed by the participating judges, and affects salary only indirectly as the judge must make up the difference.
V. Indirect Effect of Discrimination against Judges
Plaintiffs argue that even if the reduction in state contributions towards judges' health care premiums does not reflect a direct diminution of their compensation, the amendment to section 167(8) nevertheless indirectly diminishes their compensation and unconstitutionally discriminates against judges, and is therefore still unconstitutional under the United States Supreme Court's Hatter framework. The plaintiffs maintain that the amendment to section 167(8) treats judges worse than other state employees who were able to negotiate benefits in exchange for the premium contribution reductions, or even opt out from the reduction entirely. They argue the legislation is similar to a law struck down as violative of the Federal Compensation Clause in Hatter.
As we have done in the past, we apply the analysis of Hatter -that a cost increase that indirectly affects judicial compensation is not unconstitutional, so long as the increase does not target judges for disadvantageous treatment-and we conclude that the state law is not the type of legislatively targeted discrimination impermissible under our Judicial Compensation Clause ( Matter of Maron, 14 N.Y.3d at 255-256, 899 N.Y.S.2d 97, 925 N.E.2d 899 [applying Hatter to freeze on judicial salaries challenged in companion case Chief Judge of State v. Governor of State ] ). In Hatter, the Supreme Court interpreted the Federal Compensation Clause, with its similar purpose and language to the state clause, when evaluating Medicare and Social Security taxes collected from federal judges. The Court concluded the Medicare tax was constitutional because it was a general tax burden borne by all citizens, and no compelling reason existed why judges should not share in such a nondiscriminatory tax. As the Court explained,
***444 "the likelihood that a nondiscriminatory tax represents a disguised legislative effort to influence the judicial will is virtually nonexistent. Hence, the potential threats to judicial independence that underlie the Constitution's compensation guarantee cannot justify a special judicial exemption from a commonly shared tax, not even as a preventive measure to counter those threats" ( Hatter, 532 U.S. at 571, 121 S.Ct. 1782 ).
In contrast, the Hatter Court identified four features of the Social Security tax that taken together lead to the conclusion that it discriminated against judges in a manner the Compensation Clause forbids ( id. at 572-573, 121 S.Ct. 1782 ). First, the Hatter Court considered the class of affected persons that judges should be compared against and determined the proper class consisted of those to whom the law applied, namely all federal employees.
**26 Second, the Court considered whether the law imposed the same financial obligation on all members of that class, or whether it treated judges differently from other federal employees.
*825 The Court found the law imposed a new financial obligation upon sitting judges that it did not impose on any other group of federal employees. Third, the Court determined that the law adversely affected judges as it imposed a substantial cost on judges with little or no expectation of substantial benefit for most of them (see id. ). Finally, the Court examined whether there was a sound justification for the statutory distinction between judges and other federal employees. The Court noted that Congress did not explain its rationale, and the government's position-that the disparate tax treatment of judges was instituted to make the judicial retirement system contributory like the system for other federal employees-was illogical inasmuch as judges have life-tenure (see id. at 573-574, 121 S.Ct. 1782 ).[6] "Taken together," the Court concluded,
"these four characteristics reveal a law that is special-in its manner of singling out judges for ***445 disadvantageous treatment, in its justification as necessary to offset advantages related to constitutionally protected features of the judicial office, and in the degree of permissible legislative discretion that would have to underlie any determination that the legislation has 'equalized' rather than gone too far" ( id. at 576, 121 S.Ct. 1782 ).
Applying the Hatter factors here, first, the "history, context, statutory purpose, and statutory language, taken together, indicate that the category of [state] employees is the appropriate class against which we must measure the asserted discrimination" (see Hatter, 532 U.S. at 572, 121 S.Ct. 1782 [internal quotation marks omitted] ). Second, when plaintiffs filed this action, the vast majority of state employees also saw the State's contribution to their health care premiums diminish. Thus, the law imposes the new financial obligation on all participating state employees, and does not treat judges differently than nearly every other state employee (cf. Hatter, 532 U.S. at 573, 121 S.Ct. 1782 ). Third, the new policy does adversely affect judges, as it imposes a substantial cost on judges with no benefit. The benefit enjoyed by the vast majority of other state employees, however-protection from layoffs for unionized employees who accepted the reduction in premiums as part of the collective bargaining process-is a benefit already enjoyed by state judges as part of protecting their judicial independence. Furthermore, the "managerial" and "confidential" employees are in the same position, suggesting that the increased contributions operate more like the non-discriminatory Medicare tax in Hatter. Under these circumstances, where similarly situated employees receive the same treatment, excluding judges would be tantamount to offering "a special judicial exemption" from the commonly shared burden ( id. at 571, 121 S.Ct. 1782 ).[7]
*826 **27 THE FOURTH FACTOR IS NOT RELEVANT HERE, AS the distinction in contributions is based on salary grade, not judicial office (see id. at 573-574, 121 S.Ct. 1782 ). Taking these four factors ***446 together, the adjustment of the State's contribution to its employees' health care premiums does not "reveal a law that is special" in how it disadvantages judges ( id. at 576, 121 S.Ct. 1782 ). As such, plaintiffs have failed to establish a violation of the Compensation Clause based on discriminatory treatment.
VI. Conclusion
The primary goal of the Compensation Clause-protecting the independence of the judiciary-is not implicated when the State contributes a smaller percentage towards all employees' health care premiums. A contribution to health care premiums, which varies from year to year, is not compensation within the context of the Compensation Clause. Moreover, even though the reduction indirectly diminishes judicial compensation, the legislature has not singled out judges for disadvantageous treatment. Where, as here, the reduction applies to all state employees, there is not even a suggestion that judges are being targeted. As such, the change in state contributions does not jeopardize the independence of the judiciary or "represent[ ] a disguised legislative effort to influence the judicial will" ( Hatter, 532 U.S. at 571, 121 S.Ct. 1782 ).
Accordingly, the judgment should be reversed, without costs, plaintiffs' motion for summary judgment denied, and judgment granted in favor of defendant declaring Civil Service Law § 167(8) does not violate the Compensation Clause of the New York State Constitution ( N.Y. Const., art. VI, § 25 [a] ).

For ease of discussion, both judges and justices of the Unified Court System are referred to here as "judges."

The managerial and confidential employees constitute approximately six percent of the State's 189,000 employees, and the union members who had not adopted the agreement were approximately two percent. At oral argument, the State asserted that the change to contributions now applies to all employees.

Contrary to Judge Wilson's contention, this appeal is properly before us (Wilson, J., concurring op. at 459-460, 68 N.Y.S.3d at 36-37, 90 N.E.3d at 835-36). Rent Stabilization Assn. of N.Y. City v. Higgins, 83 N.Y.2d 156, 168, 608 N.Y.S.2d 930, 630 N.E.2d 626 (1993) does not suggest otherwise, as there the appeal involved more issues than just the constitutional validity of a statute.

Justice Dillon notes the 1894 Constitution is "the document that is of the most historical importance to this matter" (Dillon, J., concurring op. at 449, 68 N.Y.S.3d at 29, 90 N.E.3d at 828). Consistently throughout this document, "compensation" is used to describe a quantifiable sum, while salary is used more specifically to describe payment for labor. For example, article I, § 7, states that "just compensation" is required for a taking of private property, which will be an "amount" to be paid to the landowner. When compensation is discussed in relation to various officeholders, the term either refers to salary or to salary plus remuneration for costs necessarily incurred in fulfillment of the officeholders' obligations: the governor shall receive a set salary and have a residence provided (art. IV, § 4), legislators shall receive salary plus a sum for the amount of miles they travel to and from session, and in some circumstances an additional per diem allowance (art. III, § 6). Tellingly, the 1894 Constitution set the "salary" of the Lieutenant Governor, before clarifying that the officeholder "shall not receive or be entitled to any other compensation, fee or perquisite, for any duty or service he may be required to perform by the Constitution or by law" (art. IV, § 8). A "perquisite" is defined by Black's as "[a] privilege or benefit given in addition to one's salary or regular wages" (10th ed. 2014) (see also Black's Law Dictionary [1st ed. 1891]; Bouvier's Law Dictionary 2574 [1914] ). The rule against superfluities suggests that, contrary to Justice Dillon's conclusion, "compensation," while undoubtedly a broader term than "salary," was not used so broadly as to include privileges or benefits (see Hibbs v. Winn, 542 U.S. 88, 101, 124 S.Ct. 2276, 159 L.Ed.2d 172 [2004] ).

We do not opine on whether the "wide array of permutations" listed by Justice Dillon are compensation for constitutional purposes (Dillon, J., concurring op. at 452, 68 N.Y.S.3d at 31, 90 N.E.3d at 830). Our opinion is confined to the question before us: whether a reduction in the percentage of the State's contributions to the costs of health insurance premiums constitutes a diminution in judicial compensation.

The Court further observed that the " 'equaliz[ation]' in question takes place not by offering all current federal employees (including judges) the same opportunities but by employing a statutory disadvantage which offsets a constitutionally guaranteed advantage" (Hatter, 532 U.S. at 574, 121 S.Ct. 1782 ). "Hence, to accept the 'justification' offered here is to permit, through similar reasoning, taxes which have the effect of weakening or eliminating those constitutional guarantees necessary to secure judicial independence, at least insofar as similar guarantees are not enjoyed by others" (id. ).

In Hatter, Congress imposed a different financial burden on federal judges that it did not impose on nearly any other federal employees, and the government stated that the purpose for the disparate treatment of federal judges was to compensate for a constitutional guarantee intended to ensure judicial independence. Here, by contrast, the State did not treat judges differently when reducing its premium contributions because it wanted to "equalize" the fact that state judges are not subject to layoffs. Rather, the State did not treat judges differently from other state employees at all, except insofar as the judges were not offered a benefit to which they were already constitutionally entitled and therefore could not be offered.