DYK, Circuit Judge,
with whom BRYSON, Circuit Judge, joins, dissenting.
The majority opinion brings to mind an exchange between Learned Hand and Justice Holmes. Judge Hand enjoined Justice Holmes to “[d]o justice” on the bench, but the Justice demurred: “That is not my job. My job is to play the game according to the rules.” Learned Hand, A Personal Confession, in The Spirit of Liberty 302, 306-07 (Irving Dilliard ed., 3d ed. 1960). If the Supreme Court must play by the rules, that duty must be doubly binding on subordinate federal courts. Fidelity to this principle mandates adherence to the Supreme Court’s opinion in United States v. Will, 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980).
I
While the majority’s approach has much to recommend it as a matter of justice to the nation’s underpaid Article III judges, it has nothing to recommend it in terms of the rules governing adjudication. “The criterion of constitutionality is not whether we believe the law to be for the public good,” Adkins v. Children’s Hosp., 261 U.S. 525, 570, 43 S.Ct. 394, 67 L.Ed. 785 (1923) (Holmes, J., dissenting), but whether the law comports with the Supreme Court’s authoritative construction of the Constitution. Here, the issue is the scope of the Supreme Court’s 1980 decision in Will. Will’s holding is squarely on point. The Supreme Court’s framing of the issue was unmistakably clear: “when, if ever, does the Compensation Clause prohibit the Congress from repealing salary increases that otherwise take effect automatically pursuant to a formula previously enacted?” 449 U.S. at 221, 101 S.Ct. 471. The answer was that a future salary increase “becomes irreversible under the Compensation Clause” when it “vests,” id., and that it “ ‘vests’ for purposes of the Compensation Clause only when it takes effect as part of the compensation due and payable to Article III judges,” id. at 228-29, *1188 101 S.Ct. 471. The Court’s opinion in Will is unambiguous that the Court adopted what it has characterized as a “categorical” rule. See, e.g., Plant v. Spendthrift Farm, Inc., 514 U.S. 211, 239-40, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995).
The Court in Will explained that for two of the years,
the statute was passed before the Adjustment Act increases had taken effect — before they had become a part of the compensation due Article III judges. Thus, the departure from the Adjustment Act policy in no sense diminished the compensation Article III judges were receiving; it refused only to apply a previously enacted formula.
A paramount — indeed, an indispensable — ingredient of the concept of powers delegated to coequal branches is that each branch must recognize and respect the limits on its own authority and the boundaries of the authority delegated to the other branches. To say that the Congress could not alter a method of calculating salaries before it was executed would mean the Judicial Branch could command Congress to carry out an announced future intent as to a decision the Constitution vests exclusively in the Congress. We therefore conclude that a salary increase “vests” for purposes of the Compensation Clause only when it takes effect as part of the compensation due and payable to Article III judges.
449 U.S. at 228-29, 101 S.Ct. 471 (footnotes omitted).
Under Will’s bright-line vesting rule, Congress was free to “abandon” a statutory formula and revoke a planned cost-of-living adjustment (“COLA”), as long as the revoking legislation was enacted into law before the COLA “took effect,” that is, became “due and payable” (i.e., before October 1, the first day of the next fiscal year). Id. at 227-29, 101 S.Ct. 471. In Will Years 1 and 4, Congress missed that deadline, and the Court held that the belated withdrawal of judges’ COLAs violated the Compensation Clause. Id. at 226, 230, 101 S.Ct. 471. But in Will Years 2 and 3, COLA-blocking statutes signed before October 1 were upheld, even though one of those statutes eliminated the promised COLA just a day before it would have taken effect. Id. at 229, 101 S.Ct. 471.
Will thus made clear that a future salary increase only becomes protected by the Compensation Clause when it becomes “due and payable”; an increase which is merely anticipated or expected has not vested, and is not protected. By declining to follow Will’s clear vesting rule here, the majority also rejects the carefully crafted panel opinion in Williams v. United States, 240 F.3d 1019, 1039 (Fed.Cir.2001), reh’g denied, 240 F.3d 1366 (Fed.Cir.2001) (en banc), whose view of Will was supported at the time by a clear majority of the en banc court. See Williams, 240 F.3d at 1366 (eight judges concurring in the denial of rehearing en banc because “we are duty-bound to enforce [Will’s ] rule. If we have incorrectly read the Will opinion, the Supreme Court will have the opportunity to correct the error.”).
II
The majority attempts to redefine the constitutional test as turning not on “vesting,” but on “reasonable expectations,” a concept that appears nowhere in the Will opinion. To justify this shift, the majority seeks to distinguish Will on its facts, namely on the dubious ground that the “automatic” salary adjustment scheme in Will was different from the “automatic” salary adjustment scheme in place in Williams and here. But even if factual differences were pertinent (which, as we discuss below, could not support a depar *1189 ture from Will’s holding), there is no material difference between the statutes in Will and those in the Williams years (1995, 1996, 1997, and 1999). The Will statutes and the Williams statutes were not different insofar as they tied judicial compensation to General Schedule (“GS”) compensation, nor were they materially different as far as the definiteness of the GS COLA was concerned. Contrary to the majority’s suggestion, under both schemes, the COLA was “required” unless the President altered the COLA in response to “national emergency” or “economic conditions.” Compare 5 U.S.C. § 5305(c)(1) (1976) with 5 U.S.C. at § 5303(b)(1) (2006). As the House Report to the 1990 Act stated, “[t]he President would have discretion [under the 1990 Comparability Act] to alter this adjustment.... This discretion is substantially similar to current law,” i.e., the 1975 Act. H.R.Rep. No. 101-906, at 88 (1990).[1] And under both statutory schemes, the GS COLA, once established, would “take effect automatically.” Will, 449 U.S. at 221, 101 S.Ct. 471.[2] Thus, the statutory schemes appear “strikingly similar” for all practical purposes. Williams, 240 F.3d at 1027.
Nevertheless, the majority asserts that the expectation of a COLA created by the Williams statutes was significantly more “precise and definite,” Majority Op. 1183, because under Will’s more complex scheme, there was greater discretion over the COLA — an assertion which is accurate only insofar as the President’s agent and Advisory Committee had greater discretion in setting the initial amount of the GS COLA. Under each statutory scheme, the President’s discretion was the same.[3]
But whatever the discretion, if the test were “reasonable expectations,” then the key question would not be how the statutory scheme initially determined a COLA, but whether the amount of the COLA had become “precise and definite” at the time the blocking statute thwarted the judges’ expectations. In this respect, Will cannot be distinguished from Williams. For Will Year 3, no “judicial divination,” Majority Op. 1181, would have been required: a GS COLA of 5.5% had already been specified in the President’s Alternative Plan, 14 Weekly Comp. Pres. Docs. 1480 (Aug. 31, 1978), which was adopted and transmitted to Congress by the President a month before the Year 3 blocking statute was enacted. Will, 449 U.S. at 229, 101 S.Ct. 471. The President had no further discretion to change the amount of the COLA. As the majority notes, “once the Executive had determined the amount,” the adjustments in Will were automatically opera *1190 tive. Majority Op. 1183 (quoting Will, 449 U.S. at 203, 101 S.Ct. 471) (internal quotation marks omitted). In the Williams years, at the time the blocking statutes were enacted, the prospective amount of the GS COLA could be calculated based on the Employment Cost Index figures released by the Bureau of Labor Statistics, although the President generally did not announce a final amount until after the blocking statutes were enacted.[4] Thus, the COLA in Will Year 3 was just as “precise and definite” as the COLAs in the Williams years.
Of course, the COLAs remained uncertain in another respect: in both Will and Williams, the presumptive GS COLA could still be overridden by Congressional action, and in fact it was overridden for one of the Williams years.[5] Again, there is no meaningful difference between the situations in Will and Williams.[6] To summarize: in both Will Year 3 and in each of the Williams years, at the time the judges’ COLA was blocked, the amount of the GS COLA had been established, the President retained no discretion to change the GS COLA, and the COLA would have taken effect automatically, absent Congressional intervention. The Supreme Court upheld the blocking statute in Will Year 3. 449 U.S. at 229, 101 S.Ct. 471. Yet the majority maintains that the blocking statutes in Williams offend the Constitution. This distinction is baffling.
Finally, the majority here suggests that Will is distinguishable because the statutes here (unlike the statutes in Will) imposed limits on the judges’ outside income, without “an increase in judicial pay.” Majority Op. 1182. But the majority can hardly make a credible claim that judges’ outside compensation is protected by the Compensation Clause, and it follows that the reduction of outside compensation cannot create a Compensation Clause issue where none would otherwise exist.[7]
*1191 Ill
Even if the two statutory schemes were meaningfully different, and the Williams scheme created “reasonable judicial expectation[s] of future compensation” that did not exist in Will, Appellants’ Br. 29-31, that would be quite beside the point. Neither counsel for the appellants nor the majority is able to explain how that difference authorizes this court to disregard Will’s clear vesting rule. The majority concedes that “the vesting rules considered in Will are not expressly limited to the 1975 Act.” Majority Op. 1183. There is no basis for concluding that a “reasonable expectations” test has supplanted the Will vesting rule as the governing test. Certainly no decision of the Supreme Court has shifted the governing principle from vesting to reasonable expectations. There is not even a claim that subsequent decisions of the Court have somehow “underminefd] the reasoning” of Will. United States v. Hatter, 532 U.S. 557, 571, 121 S.Ct. 1782, 149 L.Ed.2d 820 (2001) (quoting Will, 449 U.S. at 227 n. 31, 101 S.Ct. 471) (internal quotation marks omitted). And even if Will had been undermined, it would not be this court’s prerogative to overrule it. See id. at 567, 121 S.Ct. 1782 (noting that because Evans had been undermined but not yet “expressly overrule^],” the Federal Circuit “was correct in applying Evans” and thereby “invit[ing] us to reconsider” it).
So too our job is to follow the holding of Will, not to confine it to its facts. Numerous Supreme Court decisions, and our own decisions, have made this clear. As the Supreme Court held in Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd., a Court of Appeals must not “confus[e] the factual contours of [Supreme Court precedent] for its unmistakable holding” in an effort to reach a “novel interpretation” of that precedent. 460 U.S. 533, 534-35, 103 S.Ct. 1343, 75 L.Ed.2d 260 (1983) (per curiam). See also, e.g., Marmet Health Care Ctr., Inc. v. Brown, — U.S. -, 132 S.Ct. 1201, 1202, 182 L.Ed.2d 42 (2012) (per curiam) (a state court “misread[ ] and disregarded] the precedents of this Court” when it held the Federal Arbitration Act’s scope to be “more limited than mandated by this Court’s previous cases”); Ariad Pharms., Inc. v. Eli Lilly & Co., 598 F.3d 1336, 1347 (Fed.Cir.2010) (en banc) (“As a subordinate federal court, we may not so easily dismiss [the Supreme Court’s] statements as dicta but are bound to follow them.”).
The fact that three Justices of the Court, dissenting from a denial of certiorari, opined that Will might be distinguished from Williams is not authoritative. See Williams, 535 U.S. at 917, 122 S.Ct. 1221 (Breyer, J., joined by Scalia & Kennedy, JJ., dissenting). A dissent from a denial of certiorari cannot “destroy[] the precedential effect” of a prior opinion. Teague v. Lane, 489 U.S. 288, 296, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). This court has recognized that neither the agreement of three dissenting Justices, nor the approval of their reasoning by concurring Justices in later cases, can “transform a dissent into controlling law.” Prometheus Labs., Inc. v. Mayo Collaborative Servs., 628 F.3d 1347, 1356 n. 2 (Fed.Cir.2010), rev’d on other grounds, Mayo Collaborative Servs. v. Prometheus Labs., Inc., — U.S. -, 132 S.Ct. 1289, 182 L.Ed.2d 321 (2012).
In short, neither the dissent from denial of certiorari in Williams nor the Supreme Court’s remand in this case can be read as an invitation for this court to perform reconstructive surgery on Will. The Supreme Court may distinguish its own opinions by limiting them to their facts, see, e.g., Williams v. Illinois, — U.S. -, 132 S.Ct. 2221, 2242 n. 13, 183 L.Ed.2d 89 *1192 (2012), or choose to overrule them, see, e.g., Hatter, 532 U.S. at 567, 121 S.Ct. 1782, but that is not an option for this court. We respectfully dissent.[8]

. Plainly Congress saw the references in the 1975 Act to "economic conditions” and in the 1990 Act to "serious economic conditions” as functionally the same, since the President’s discretion was to remain "substantially similar” under the 1990 Act as before.

. Judge O’Malley's concurrence misreads the dissent in suggesting that we view the COLAs in Will as "automatic” only because "the statutory scheme had run its course” in the disputed years. Concur. Op. 1193.

. Will's statutory scheme
required the President to appoint an adjustment agent [who] was to compare sala-
rles in the civil service with those in the private sector and then recommend an adjustment to an Advisory Committee. Subsequently, the Committee would make its own recommendation to the President, accepting, rejecting, or modifying the agent’s recommendation as the Committee thought desirable. The President would have to accept the Committee’s recommendation— unless he determined that national emergency or special economic conditions warranted its rejection.
Williams v. United States, 535 U.S. 911, 917, 122 S.Ct. 1221, 152 L.Ed.2d 153 (2002) (Breyer, J., joined by Scalia & Kennedy, JJ., dissenting).

. For all the Williams years, GS salary adjustment tables were promulgated by Executive Order in the preceding December. Exec. Order 12944, 60 Fed. Reg. 309 (Dec. 28, 1994); Exec. Order 12984, 61 Fed. Reg. 237 (Dec. 28, 1995); Exec. Order No. 13033, 61 Fed. Reg. 68987 (Dec. 27, 1996); Exec. Order No. 13106, 63 Fed. Reg. 68151 (Dec. 7, 1998). In each year, the judges' COLAs had been blocked several weeks to months earlier. See Pub. L. 103-329, Title VI, § 630(a)(2), 108 Stat. 2382, 2424 (1994); Pub. L. 104-52, Title VI, § 633, 109 Stat. 468, 507 (1995); Pub. L. 104-208, Title VI, § 637, 110 Stat. 3009-364 (1996); Pub. L. 105-277, Title VI, § 621, 112 Stat. 2681-518 (1998). For one of the Williams years, 1996, the President transmitted an Alternative Plan to Congress setting a 2% GS COLA before the blocking statute was passed. 31 Weekly Comp. Pres. Docs. 1466, 1466-67 (1995).

. For 1995, Congress reduced the GS COLA to 2%. Pub. L. 103-329, Title VI, § 630(a)(1), 108 Stat. 2382, 2424 (1994). The projected GS COLA had been 2.6%. See Sharon S. Gressle, Cong. Research Serv., Order No. RS20278, Judicial Salary-Setting Policy 6 (March 6, 2003).

. Under the Will scheme, in addition to enacting separate legislation, Congress could have disapproved the Alternative Plan by a one-house legislative veto. Will, 449 U.S. at 204, 101 S.Ct. 471. But a legislative veto would not have zeroed out the GS COLA; it would have reinstated the amount recommended to the President, id., which was higher than the President's figure in Will Year 3. See 14 Weekly Comp. Pres. Docs. 1480 (Aug. 31, 1978). It is unclear how Congressional action to increase the GS COLA could have made the judges’ expectations of a COLA in Will Year 3 less “precise and definite.” The legislative veto was held unconstitutional after Will and before the Williams years. INS v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

. In fact, the 1989 Act did increase judicial pay by 25%, thus offsetting the limitations on outside income. Pub. L. 101-194 § 703(a)(3), 103 Stat. 1716, 1768 (1989).

. Appellants also argue that the 2007 and 2010 COLAs were improperly withheld because no blocking legislation was enacted in those years, and Section 140, as amended in 2001, was either inapplicable or unconstitutionally discriminated against federal judges under the Supreme Court's decision in Hatter. While we agree that this issue is not resolved by Will, these statutory and constitutional arguments were not properly raised below, and we decline to address them here.