This opinion is uncorrected and subject to revision before publication in the New York Reports.
-------------------------------------------------------------------

No. 67
Eileen Bransten, &c., et al.,
           Respondents,
        v.
State of New York,
           Appellant.

Judith N. Vale, for appellant.
Alan M. Klinger, for respondents.

PER CURIAM:

The issue presented on this appeal is whether Civil Service Law § 167 (8), as amended, authorizing a reduction of the State's contribution to health insurance benefits for State employees, including members of the State judiciary, violates the Judicial Compensation Clause of the State Constitution (NY Const,

- 1 -

art VI, § 25 [a]).  We conclude the State's contribution is not judicial compensation protected from direct diminution by the Compensation Clause, and the reductions in contributions do not have the effect of singling out the judiciary for disadvantageous treatment.  Therefore, plaintiffs' constitutional challenge fails.


I.  Statutory and Regulatory Background

State employees, including members of the judiciary, are eligible to participate in health insurance plans that are paid, in part, by the State's contributions towards insurance premiums (Civil Service Law §§ 161, 167; see Governor's Mem, Bill Jacket, L 1956, ch 461 at 3).  Participation is optional and the choice of which insurance to purchase is within the sole discretion of employees.

In 2011, facing a budget crisis, the Legislature negotiated with State-employee unions to avoid layoffs in exchange for a percentage reduction to the State's premium contributions, as well as salary freezes and unpaid furloughs. Thereafter, the Legislature amended Civil Service Law § 167 (8) to authorize the Civil Service Commission to make these reductions for nearly all State employees and retirees.  These changes also applied to unrepresented State employees and retirees not involved in negotiations, including approximately

1,200 judges,[1] and over 12,000 "managerial" or "confidential" employees.  At the time, the changes did not apply to members of unions who had not agreed to modify their collective bargaining agreement, but those employees were subject to layoffs (4 NYCRR 73.12).[2]  The implementing regulations, effective October 1, 2011, provided for a two to six percentage point reduction in the State's health care contributions, depending on the employee's salary grade (4 NYCRR 73.3 [b]).  Judges are not assigned salary grades, but all Supreme Court Justices receive a salary above "salary grade 10," and therefore the State reduced its premium contribution from 90 percent to 84 percent for judges who elect to enroll in the State's health insurance plan, and for judges who retired after January 1, 2012.  The regulations also reduced the State's contribution for employees who elected to participate in the State plan and retired between January 1, 1983 and January 1, 2012 from 90 to 88 percent of the cost of coverage (4 NYCRR 73.3 [b]).

## II. Plaintiffs' Action

Plaintiffs are 13 named current and retired Justices of

---

[1] For ease of discussion, both judges and justices of the Unified Court System are referred to here as "judges."

[2] The managerial and confidential employees constitute approximately six percent of the State's 189,000 employees, and the union members who had not adopted the agreement were approximately two percent.  At oral argument, the State asserted that the change to contributions now applies to all employees.

Supreme Court, the Association of Justices of the Supreme Court of the State of New York, and the Supreme Court Justices Association of the City of New York.  Plaintiffs filed suit against the State seeking a declaratory judgment that the statute that authorizes the reduction in contributions towards health insurance premiums, Civil Service Law § 167 (8), violates the Compensation Clause of the New York State Constitution, and appropriate injunctive relief.

Supreme Court denied the State's motion to dismiss for failure to state a claim pursuant to CPLR 3211 (a) (7).  On the State's appeal from this interlocutory order, the Appellate Division affirmed, holding that compensation includes health insurance benefits, and that the decrease in the State's contribution level discriminates against judges because, unlike public-sector unionized employees, judges cannot collectively bargain to obtain compensation for the reduction in the State's contributions (Bransten v State, 117 AD3d 455 [1st Dept 2014]).

The parties subsequently cross-moved for summary judgment.  Supreme Court denied the State's motion and granted the plaintiffs' to the extent of declaring Civil Service Law § 167 (8) and its implementing regulations unconstitutional as applied to members of the judiciary (Bransten v State of New York, 2015 WL 1331265 [Sup Ct, New York County 2015]).  The State appealed to this Court as of right directly from Supreme Court's

judgment pursuant to CPLR 5601 (b) (2).[3]


   III.  Judicial Compensation Clause Salutary Purpose

        Article VI, section 25 of the New York State

Constitution provides that the compensation of State sitting and

retired judges: "shall be established by law and shall not be

diminished during the term of office for which [a judge] was

elected or appointed."  The term "compensation" is not defined in

the Constitution, but its meaning is inextricably tied to the

purpose of the Compensation Clause, which is "to promote judicial

independence" and, relatedly, to "ensure that the pay of

prospective judges, who choose to leave their practices or other

legal positions for the bench will not diminish" (Matter of Maron

v Silver, 14 NY3d 230, 250 [2010], citing United States v Will,

449 US 200, 221 [1980]).

        Historically, the focus of the Compensation Clause has

been to protect against the danger of external control over

judicial pay as a means by which to exert influence over the

judiciary.  "[T]he Legislature was precluded from diminishing

salaries in recognition of the risk that salary manipulation

might be used as a tool to retaliate for unpopular judicial

---

[3] Contrary to Judge Wilson's contention, this appeal is
properly before us (Wilson, J. concurring op at 2).  Rent
Stabilization Ass'n v Higgins (83 NY2d 156, 168 [1993]) does not
suggest otherwise, as there the appeal involved more issues than
just the constitutional validity of a statute.

decisions" (Matter of Maron, 14 NY3d at 252).  As with the similar prohibition contained in the federal Compensation Clause, the anti-diminution language was intended to protect judges from the corruptive force of financial uncertainty, in order to maintain an able and independent judiciary, free of coercion from the other branches (see US Const, art III, § 1 [judges' compensation "shall not be diminished during their Continuance in Office"]; Matter of Maron, 14 NY3d at 250 [purpose of State clause is same as federal clause: to promote judicial independence]; Will, 449 US at 218-220 [framers of federal constitution made certain the compensation of judges was protected from one of the evils that brought about the Revolution]; United States v Hatter, 532 US 557, 568-569 [2001] [founders recognized importance of protecting judiciary from financial dependence on legislature]).

To that end, and as this Court explained in Matter of Maron, the legislature may not enact laws that directly diminish judicial compensation or accomplish the same result by singling out judges for disadvantageous treatment that indirectly diminishes their pay (14 NY3d at 252-54; see also Hatter, 532 US at 571).  Thus, plaintiffs may establish a Compensation Clause violation here by demonstrating that the State's reduced contribution to their health insurance premiums: 1) is a direct diminishment of their compensation; or 2) is an indirect diminishment that targets judges for disadvantageous treatment.

IV.  <u>Prohibition on Direct Diminution in Judicial Compensation</u>

Under our case law, protected judicial "compensation," as that term is used in the Compensation Clause, refers to a judge's salary and any additional monies that serve as a permanent remuneration for costs necessarily incurred in fulfillment of a judge's judicial obligations.  So, for example, in <u>People ex rel. Bockes v Wemple</u> (115 NY 302, 310 [1889]), the Court held that the legislature had increased judicial compensation by providing a fixed amount "'in lieu of' expenses . . . to compensate [the judge] further for what the office entailed . . . in the way of duties and work."  The Court further explained that "the intention of the legislature was to make a permanent addition to the stated salary, which should be beyond the power of subsequent legislatures to affect" (<u>id.</u>).  Similarly, in <u>Gilbert v Board of Supervisors of County of Kings</u> (136 NY 180, 185 [1892]), the Court recognized that "the word compensation . . . was understood to mean salary of the judge as such, and the allowance for expenses."  Notably, the Court distinguished between compensation within the meaning of the Constitution -- what the Court described as the salary set for judges in their role as sitting judges -- and a discretionary allowance set by a municipality or board for a judge's local service as a Commissioner of Jurors (see <u>id.</u> at 185-186; see <u>also</u> <u>Bockes</u> at 309-310).  From these cases the two essential characteristics of constitutionally-protected judicial

compensation can be gleaned: the remunerative purpose and the permanence of the legislative allotment.[4]

The health care contribution at issue here exhibits neither of these characteristics.  It is not part of a judicial salary or a permanent remuneration for expenses necessarily incurred in fulfillment of judicial obligations.  Nevertheless, plaintiffs argue that compensation means anything of value provided by an employer and includes health care benefits, as they "are an integrated part of the compensation package provided

---

[4] Justice Dillon notes the 1894 Constitution is "the document that is of the most historical importance to this matter" (Dillon, J. concurring op at 6).  Consistently throughout this document, "compensation" is used to describe a quantifiable sum, while salary is used more specifically to describe payment for labor.  For example, article I, section 7, states that "just compensation" is required for a taking of private property, which will be an "amount" to be paid to the landowner.  When compensation is discussed in relation to various officeholders, the term either refers to salary or to salary plus remuneration for costs necessarily incurred in fulfillment of the officeholders' obligations: the governor shall receive a set salary and have a residence provided (article IV, section 4), legislators shall receive salary plus a sum for the amount of miles they travel to and from session, and in some circumstances an additional per diem allowance (article III, section 6).  Tellingly, the 1894 Constitution set the "salary" of the Lieutenant Governor, before clarifying that the officeholder "shall not receive or be entitled to any other compensation, fee or perquisite, for any duty or service he may be required to perform by the Constitution or by law" (article IV, section 8).  A "perquisite" is defined by Black's as "[a] privilege or benefit given in addition to one's salary or regular wages" (10th ed [2014]; see also Black's 1st ed [1891]; Bouvier's Law Dictionary [1914]).  The rule against superfluities suggests that, contrary to Justice Dillon's conclusion, "compensation," while undoubtedly a broader term than "salary," was not used so broadly as to include privileges or benefits (see Hibbs v Winn, 542 US 88, 101 [2004]).

to State employees and Judges."  While plaintiffs are correct that the State pays a percentage of premiums for those employees who choose to participate in a State subsidized health care plan, that fact does not transform the State's contribution into judicial compensation within the meaning of our State Constitution.  This Court has previously recognized that compensation for constitutional purposes has a unique and historical purpose (see Bockes, 115 NY at 306-307; Gilbert, 136 NY at 184-185).

Indeed, plaintiffs are unable to point to anywhere in the legislative schema where the State's contribution is referred to as "compensation."  In fact, Chapter 567 of the Laws of 2010, which created the Special Commission on Judicial Compensation, states that the Commission's purpose was to "examine, evaluate and make recommendations with respect to adequate levels of compensation *and non-salary benefits* for judges and justices of the state-paid courts of the unified court system" (emphasis added).  This suggests that, contrary to plaintiffs' argument, judges' health care benefits are distinct from judicial compensation.

Nor does the State's expansion of the class of benefits available to its employees, including judges, provide clear indication that the Legislature intended for its contribution towards premiums to be treated as a permanent addition to a judicial salary, whether as part of a judge's pay or as a fixed

amount in lieu of expenses.  In fact, since the Legislature created a centralized State health insurance fund in 1956 (see Civil Service Law § 167 [6]), the State has, on occasion, adjusted the costs and benefits afforded to State employees who have opted into the program by, for example, increasing employees' annual deductibles or changing the amounts employees must pay for out-of-network services.  Notably, the State's contribution to employee health insurance premiums have been changed before, dropping from 100 percent in 1967 to 90 percent in 1983 (Civil Service Law § 167 [1] [a]; see also L 1983, ch 14).  Plaintiffs concede that the State is not required to keep pace with increasing health care costs, which undermines their argument that maintaining the level of State subsidy is necessary to avoid constitutionally impermissible diminution of judicial compensation.  Tellingly, "the whole matter" of choosing a health plan -- or whether to participate in one at all -- is left to the employee (cf. Gilbert, 136 NY at 185 [additional payment for serving as County Commissioner of Jurors is not compensation for constitutional purposes where the whole matter was left to the discretion of the county's board of supervisors]).

Plaintiffs' approach also lacks a standard by which to distinguish between constitutionally protected compensation and any amount of monies provided directly to judges or as a discount for other costs.  For plaintiffs, compensation would include even those items that have an indisputably indirect impact on salary,

as, for example, parking privileges, discounts in a cafeteria, or even free coffee and bagels in a communal kitchen.  As these examples illustrate, adopting plaintiffs' position renders meaningless "compensation" as a constitutional term of art.  It would also leave us without any standard by which to guide future decisions.

Significantly, the challenged percentage reduction in the State's contribution does not jeopardize judicial independence -- the essential evil that the Compensation Clause is intended to address (see Matter of Maron, 14 NY3d at 252).  Granted, health care benefits may be valuable to an employee, but the percentage reduction to the State's contribution is not equivalent to the base salary upon which a judge subsists, and which, if tampered with, "amounts to a power over a [person's] will" (Will, 449 US at 218; Hatter, 532 US at 568, quoting Alexander Hamilton, Federalist No. 79, at 472; see also Matter of Maron, 14 NY3d at 252).[5]  Simply put, the Compensation Clause uses proscriptive language to ensure that a judge will not hesitate to make a decision for fear that the outcome puts the judge's livelihood in jeopardy.

---

[5] We do not opine on whether the "wide array of permutations" listed by Justice Dillon are compensation for constitutional purposes (Dillon, J. concurring op at 12).  Our opinion is confined to the question before us: whether a reduction in the percentage of the State's contributions to the costs of health insurance premiums constitutes a diminution in judicial compensation.

While the reduction in the State's contributions to the costs of health insurance premiums would increase a participating judge's share of the cost associated with the chosen health care plan, such an increase is not the equivalent of a direct reduction in judicial compensation. It is a cost that is voluntarily assumed by the participating judges, and affects salary only indirectly as the judge must make up the difference.

V. <u>Indirect Effect of Discrimination Against Judges</u>

Plaintiffs argue that even if the reduction in State contributions towards judges' health care premiums does not reflect a direct diminution of their compensation, the amendment to section 167 (8) nevertheless indirectly diminishes their compensation and unconstitutionally discriminates against judges, and is therefore still unconstitutional under the United States Supreme Court's <u>Hatter</u> framework. The plaintiffs maintain that the amendment to section 167 (8) treats judges worse than other State employees who were able to negotiate benefits in exchange for the premium contribution reductions, or even opt out from the reduction entirely. They argue the legislation is similar to a law struck down as violative of the federal Compensation Clause in <u>Hatter</u>.

As we have done in the past, we apply the analysis of <u>Hatter</u> -- that a cost increase that indirectly affects judicial compensation is not unconstitutional, so long as the increase

does not target judges for disadvantageous treatment -- and we conclude that the State law is not the type of legislatively targeted discrimination impermissible under our Judicial Compensation Clause (Matter of Maron, 14 NY3d at 255-256 [applying Hatter to freeze on judicial salaries challenged in companion case Chief Judge of State v Governor of State]).  In Hatter, the Supreme Court interpreted the federal Compensation Clause, with its similar purpose and language to the State Clause, when evaluating Medicaid and Social Security taxes collected from federal judges.  The Court concluded the Medicaid tax was constitutional because it was a general tax burden borne by all citizens, and no compelling reason existed why judges should not share in such a nondiscriminatory tax.  As the Court explained,

> "the likelihood that a nondiscriminatory tax
> represents a disguised legislative effort to
> influence the judicial will is virtually
> nonexistent. Hence, the potential threats to
> judicial independence that underlie the
> Constitution's compensation guarantee cannot
> justify a special judicial exemption from a
> commonly shared tax, not even as a preventive
> measure to counter those threats" (Hatter,
> 532 US at 571).

In contrast, the Hatter Court identified four features of the Social Security tax that taken together lead to the conclusion that it discriminated against judges in a manner the Compensation Clause forbids (id. at 572-573).  First, the Hatter Court considered the class of affected persons that judges should be compared against and determined the proper class consisted of

those to whom the law applied, namely all federal employees.

Second, the Court considered whether the law imposed the same

financial obligation on all members of that class, or whether it

treated judges differently from other federal employees.  The

Court found the law imposed a new financial obligation upon

sitting judges that it did not impose on any other group of

federal employees.  Third, the Court determined that the law

adversely affected judges as it imposed a substantial cost on

judges with little or no expectation of substantial benefit for

most of them (see id.).  Finally, the Court examined whether

there was a sound justification for the statutory distinction

between judges and other federal employees.  The Court noted that

Congress did not explain its rationale, and the government's

position -- that the disparate tax treatment of judges was

instituted to make the judicial retirement system contributory

like the system for other federal employees -- was illogical

inasmuch as judges have life-tenure (see id. at 573-574).[6]

"Taken together," the Court concluded,

> "these four characteristics reveal a law that

---

[6] The Court further observed that the "'equaliz[ation]' in question takes place not by offering all current federal employees (including judges) the same opportunities but by employing a statutory disadvantage which offsets a constitutionally guaranteed advantage" (Hatter, 532 US at 574). "Hence, to accept the 'justification' offered here is to permit, through similar reasoning, taxes which have the effect of weakening or eliminating those constitutional guarantees necessary to secure judicial independence, at least insofar as similar guarantees are not enjoyed by others" (id.).

is special -- in its manner of singling out judges for disadvantageous treatment, in its justification as necessary to offset advantages related to constitutionally protected features of the judicial office, and in the degree of permissible legislative discretion that would have to underlie any determination that the legislation has 'equalized' rather than gone too far" (id. at 576).

Applying the Hatter factors here, first, the "history, context, statutory purpose, and statutory language, taken together, indicate that the category of [State] employees is the appropriate class against which we must measure the asserted discrimination" (see Hatter, 532 US at 572).  Second, when plaintiffs filed this action, the vast majority of State employees also saw the State's contribution to their health care premiums diminish.  Thus, the law imposes the new financial obligation on all participating State employees, and does not treat judges differently than nearly every other State employee (cf. Hatter, 532 US at 573).  Third, the new policy does adversely affect judges, as it imposes a substantial cost on judges with no benefit.  The benefit enjoyed by the vast majority of other state employees, however -- protection from layoffs for unionized employees who accepted the reduction in premiums as part of the collective bargaining process -- is a benefit already enjoyed by state judges as part of protecting their judicial independence.  Furthermore, the "managerial" and "confidential" employees are in the same position, suggesting that the increased contributions operate more like the non-discriminatory Medicare

tax in Hatter.  Under these circumstances, where similarly situated employees receive the same treatment, excluding judges would be tantamount to offering "a special judicial exemption" from the commonly shared burden (id. at 571).[7]  The fourth factor is not relevant here, as the distinction in contributions is based on salary grade, not judicial office (see id. at 573-574). Taking these four factors together, the adjustment of the State's contribution to its employees' health care premiums does not "reveal a law that is special" in how it disadvantages judges (id. at 576).  As such, plaintiffs have failed to establish a violation of the Compensation Clause based on discriminatory treatment.

## VI.  Conclusion

The primary goal of the Compensation Clause -- protecting the independence of the judiciary -- is not implicated when the State contributes a smaller percentage towards all employees' health care premiums.  A contribution to health care

---

[7] In Hatter, Congress imposed a different financial burden on federal judges that it did not impose on nearly any other federal employees, and the government stated that the purpose for the disparate treatment of federal judges was to compensate for a constitutional guarantee intended to ensure judicial independence.  Here, by contrast, the State did not treat judges differently when reducing its premium contributions because it wanted to "equalize" the fact that state judges are not subject to layoffs.  Rather, the State did not treat judges differently from other state employees at all, except insofar as the judges were not offered a benefit to which they were already constitutionally entitled and therefore could not be offered.

premiums, which varies from year to year, is not compensation within the context of the Compensation Clause.  Moreover, even though the reduction indirectly diminishes judicial compensation, the Legislature has not singled out judges for disadvantageous treatment.  Where, as here, the reduction applies to all State employees, there is not even a suggestion that judges are being targeted.  As such, the change in State contributions does not jeopardize the independence of the judiciary or "represent[] a disguised legislative effort to influence the judicial will" (Hatter, 532 US at 571).

Accordingly, the judgment should be reversed, without costs, plaintiffs' motion for summary judgment denied, and judgment granted in favor of defendant declaring Civil Service Law § 167 (8) does not violate the Compensation Clause of the New York State Constitution (NY Const, art VI, § 25 [a]).

Bransten v State of New York

No. 67

DILLON, J.(concurring):

Contributions by the State of New York toward the cost of health care insurance premiums provided to the judges and justices of the Unified Court System are part of the paid "compensation" that falls within the protective provisions of the State Constitution, article VI, § 25(a) (the Compensation Clause). For reasons set forth below, the Compensation Clause would be irrelevant to the State's health care insurance contributions if the controlling constitutional language merely guaranteed that no judicial "salary" be diminished during jurists' terms in office. However, the presence of the broader term "compensation" in the Compensation Clause casts a wider net that includes more than mere salary.

I.

The bench and bar are frequently called upon to interpret the precise meaning of words and phrases in constitutions, statutes, contracts, wills, and other legal documents. Such issues are parsed by examining words and phrases in accordance with plain language, the drafters' intent, the contexts in which words and phrases are applied, common usages

- 1 -

and understandings, the parties' reasonable expectations, and the affordance of meaning that is consistent with the whole of the document being examined.  These concepts are not alien to the interpretation of provisions in our State Constitution.  We have held that the Compensation Clause is to be construed in a manner "to give its provisions practical effect" (Ginsberg v Purcell, 51 NY2d 272, 276; see also Pfingst v State of New York, 57 AD2d 163, 165).  The Compensation Clause is to be given "a fair and liberal construction, not only according to its letter, but also according to its spirit and the general purposes of its enactment" (Pfingst v State of New York, 57 AD2d at 165, see People ex rel. McClelland v Roberts, 148 NY 360).

The New York State Constitution has had a rich and evolving history.  Constitutional conventions were convened in 1776-1777, 1821, 1846, 1867-68, 1894, 1915, 1938, 1967, and a Constitutional Commission was established for 1872-73 (see Albany Law School, "Schaffer Law Library's Guide on the New York State Constitution," available at https://www.albanylaw.edu/media/user/librarypdfs/guides/nyconsti.pdf).  The recommended Constitutions were adopted only for the years 1777, 1821, 1846, 1894 and 1938 (see Historical Society of the New York Courts, "New York State Constitutions," available at https://www.nycourts.gov/history/legal-history-new-york/history-new-york-courts-constitutions.html).  Along the way, there were many years where voters approved ad hoc amendments to the then-existing Constitutions

including, as relevant here, 1925 and 1961.

The first Constitution to address the issue of compensation for State officeholders was that of 1821.[1]  It provided in article I that "compensation" be paid to members of the State legislature and to the governor (see 1821 NY Const, art I, §§ 4, 9), but curiously made no reference to judicial pay. The Constitution of 1846 addressed judicial remuneration for the first time, entitling the State legislators, governor, lieutenant governor, and justices to "compensation" in exchange for the performance of their duties (see 1846 NY Const, art III, § 6; art IV §§ 4, 8; art VI, § 7).

The Constitution of 1894 was the first to use divergent nomenclature to describe the remuneration of State officeholders. Under a heading of "Compensation," members of the legislature were entitled to a "salary" of $1,500 per year plus reimbursement of travel expenses at a defined rate of $1 for each ten miles (see 1894 NY Const, art III, § 6).  Under another heading also titled "Compensation," the governor was entitled to a "salary" of $10,000 per year plus a furnished residence (see 1894 NY Const, art IV, § 4).  A separate paragraph regarding the lieutenant governor was titled "Salary," which was set at the sum of $5,000, but as to that officeholder, the text prohibited receipt of "any other compensation, fee or perquisite" for the performance of

---

[1] The 1821 Constitution is sometimes also referred to in literature as the Constitution of 1822, the year of its effective date.

State duties (see 1894 Const, art IV, § 8).  Whereas legislators

and the executives were each expressly entitled to "salaries,"

judges and justices were instead entitled to "compensation,"

without elaboration, and with the only reference to their

"salary" being that such money be financed for the county and

surrogate courts by the counties in which they sat (see 1894 NY

Const, art VI, §§ 12, 15).  The 1894 Constitution provided for

the first time the guarantee that judicial compensation not be

diminished during any term of office (see 1894 NY Const, art VI,

§ 12).

A 1925 amendment to the 1894 Constitution continued the

word "compensation" to describe judicial remuneration, and

continued the guarantee that compensation not be diminished

during terms in office (see NY Organization of State Jud. System,

Amend. 4 [1925]).

The 1938 Constitution continued the header of

"Compensation" for the State legislators, the governor, and for

the first time the lieutenant governor.  It was specifically

defined for those officeholders within the definitional texts as

"salary" and travel expenses for legislators, "salary" and a

residence for the governor, and straight "salary" for the

lieutenant governor (see 1938 NY Const, art III, § 6, art V, §§

3, 6).  However, the judiciary article continued to scrupulously

avoid use of the word "salary," and instead referred only to

"compensation" that was to be paid without diminishment to the

remainder of the judicial terms (see 1938 NY Const, art VI, §
25[a]).  The same language was unmolested by a 1961
constitutional amendment that reorganized the courts of the
State, and represents the language that is still controlling
today (see N.Y. Session Laws, Vol. III, 4025 [1962]; N.Y. Session
Laws, Vol. II, 2708-2734 [1961]).

A review of the various Constitutions and amendments
establishes that since 1894, legislative and executive
remuneration has been expressed as including "salary" and, where
applicable, certain defined perquisites and benefits.  In
contrast, judicial remuneration has been expressed solely and
strictly as "compensation."  The specific language of the
Compensation Clause today provides that the "compensation" of
State judges and justices "shall be established by law and shall
not be diminished during the term of office for which he or she
was elected or appointed" (NY Const, art VI, § 25[a]).

The 1894 Constitution is the document that is of the
most historical importance to this matter as it reflects the
first instance when the drafters of the New York Constitutions
expressly differentiated between the "salary" and other benefits
payable to legislators and executives, and the "compensation"
payable to members of the judiciary.  There appears to be no
available original or secondary source materials that explain the
difference in terminology.  The reason for differentiating
between salary and compensation in 1894 is not disclosed in the

Journal of the Convention, the Report of the Debate and
Proceeding of the Convention, or in the Documents of the
Convention Vols. 1-2 (see New York State Library, "Documents from
the 1894 Constitutional Convention").  Not even Charles Z.
Lincoln's The Constitutional History of New York,[2] which is
perhaps the most authoritative study of the State's early
constitutional history, provides any explanation or insight into
the contrasting terminology.  Cases decided prior to 1894 on
matters involving judicial compensation, such as People ex rel.
Bockes v Wemple (115 NY 302), Gilbert v Board of Supervisors of
Kings County (136 NY 180), and People ex rel. Follett v Fitch
(145 NY 261 [interpreting a pre-1894 statute]), are of limited
value as they predate the significant language changes adopted in
the Constitution of 1894.  Yet, there can be no question that for
the last 123 years, the distinction between "salary" and
"compensation" has conspicuously existed in the New York
Constitution.  Absent convention debate or reports reflecting the
specific intent of the drafters on this issue, our interpretation
of the meaning of such nomenclature must necessarily rest upon
the words themselves and their common usage (see Anderson v
Regan, 53 NY2d 356, 362; Rahill v Bronstein, 32 NY2d 417, 421;
People v Carroll, 3 NY2d 686, 689).

        Words matter.  "Salary" and "compensation," while

_____

        [2] Charles Z. Lincoln, The Constitutional History of New
York, Vols. I-V.  Rochester: The Lawyers Co-operative Publishing
Company, 1905-06.

related, are not one and the same.  Tellingly, the Constitution
of 1894 referred to legislative and gubernatorial "Compensation"
as a mere title header to the description and obligations of
those branches of State government (see NY Const, art III, § 6;
art IV, § 4 [1894]).  The texts within the legislative and
executive articles of the 1894 Constitution, underneath their
headers, then defined those officeholders' remuneration as
"salary" and in the specific case of the legislators and
governor, reimbursements and perquisites.  The straight $5,000
"salary" of the lieutenant governor was plainly described as such
in the absence of other perquisites or benefits, and without
reference to any complicating reference to payable compensation
(see 1894 NY Const, art IV, § 8).  Clearly the Constitution of
1894 employed the word "compensation" as a broad umbrella term,
and used the word "salary" as one component thereof, perhaps the
largest, fitting under the compensation umbrella.  Therefore,
where article VI, § 12 of that Constitution described judicial
remuneration solely in terms of "compensation" without any
reference to "salary," the drafters purposely chose to cloak the
judiciary under that umbrella, without limiting judicial
remuneration to any narrower term or definition.  The reason for
doing so might be self-evident and central to this appeal;
namely, that only remuneration for the judicial branch of
government was described in the same sentence as subject to
non-diminution during any terms of judicial office (see NY Const,

art VI, § 12).[3]  By implication and reasonable construction, the drafters of the Constitution of 1894 were seeking to provide members of the judiciary with broad protections, such that the non-diminution of compensation be expansive and extend to all forms of emoluments that judges and justices could traditionally expect to receive at that time.

For these reasons, the linguistic differential between legislators' and executives' "salaries," perquisites and benefits, as distinguished from jurists' "compensation," from 1894 forward, demonstrates that salary and compensation are not synonymous terms.

II.

State-sponsored health care coverage was not specifically mentioned in the Constitution of 1894 or its 1938 successor.  The issue has "called into life a being the development of which could not have been foreseen completely by the most gifted of [constitutional] begetters" (see State of Missouri v Holland, 251 US 416, 433).  Litigation over the meaning of judicial "compensation" has been sparse.  Three cases from the late 1800s that appear instructive on their faces address issues of judicial compensation:  People ex rel Bockes v Wemple (115 NY 302), Gilbert v Board of Supervisors of Kings

---

[3] The Constitution of 1821 had protected the governor's compensation from diminishment during any term in office (see 1821 NY Const, art 3, § 4), but that provision was dropped in subsequent Constitutions.

County (136 NY 180), and People ex rel. Follett v Fitch (145 NY 261). However each of these reported cases involve constitutional analysis, or in the case of Gilbert, a statute, that became outdated with the subsequent adoption of the Constitution of 1984 containing the distinction between "salary" and "compensation." Nevertheless, to the extent arguably relevant, Bockes, while dusty, actually supports the conclusion that the Compensation Clause is intended to protect more than mere salary.

In 1889, this Court faced the question of whether judicial compensation was limited to a $6,000 annual payment, or included an additional $1,200 annual payment authorized in lieu of job-related expense reimbursements (see People ex rel. Bockes v Wemple, 115 NY at 306). At that time, justices of the Supreme Court were entitled to compensation to the end of their elected terms in office, even if a term ended after a justice reached the mandatory retirement age of 70. The legal questions posed were twofold: 1) whether the justice's post-retirement compensation was to be paid at the rate of $6,000 per year or $7,200 per year, and 2) whether a payment of only $6,000 represented a diminution otherwise prohibited by the then-existing Constitution. This Court held that the $7,200 total amount that had been paid to the justice prior to retirement remained intact, and a continuing debt of the State, until the expiration of the official term in office to which that justice had been elected (see People ex rel.

Bockes v Wemple, 115 NY at 311).  The Court described the $1,200

payment "as much a part of the compensation to the justice as

though his salary, *eo nomine*, had been increased to compensate

him further for what his office entailed upon him in the way of

duties and work" (People ex rel. Bockes v Wemple, 115 NY at

309-10).  In other words, the precedent establishes that the

Compensation Clause is not limited to the mere and strict

"salary" that is scheduled and adjusted from time to time by the

legislature, but more broadly includes, at least in the instance

of Bockes, the "in lieu of" payment that substituted for the

reimbursement of itemized job-related expenses.[4]

--------

[4] Bockes was not without its limits.  The Board of
Supervisors for Kings County voluntarily paid the justices in
that county an additional $6,000 annual allowance for drawing
local jurors.  This Court held in 1892 that the reference in the
Compensation Clause to "compensation to be established by law"
did not extend to additional allowances that municipalities
might, in their discretion, add to remuneration for special local
services (see Gilbert v Board of Supervisors of Kings County, 136
NY at 185-86).  The Court's reasoning reached a result that was
both practical and consistent with the State's constitutional
obligations (id. at 186).  Judicial compensation extending beyond
the jurists' age-related retirement was enough of a hot-button
issue in the 1890s that it prompted an amendment to the
Constitution in 1894.  The 1894 amendment eliminated the
post-retirement payment of compensation for jurists elected after
January 1, 1894 (see NY Const, art III, § 12 [1894]).  Similarly,
in People ex rel. Follett v Fitch (145 NY 261), this Court
addressed the constitutionality of 1882 legislation that required
payment by the City of New York of up to $500 per year for
Supreme Court justices residing outside the City but assigned to
a General Term within the City, as reimbursement for expenses and
disbursements (L 1882, ch 410, § 1109, as amended; L 1883, ch
104).  This additional sum was held to be not guaranteed and not
subject to the Compensation Clause, as job-related expenses and
disbursements were already subsumed by the then-existing $1,200

Here, the majority maintains that Bockes limits judicial compensation only to remuneration that is directly related to the performance of official duties and work. In fact, Bockes did not address whether other forms of remuneration or benefits, which did not exist until decades later, could equally qualify as compensation. Today, almost 13 decades after this Court decided Bockes, judicial compensation bears little resemblance to its 19th century predecessor. Indeed, judicial compensation is complicated by a wide array of permutations including tax-advantaged 401(k) plans, flex spending medical and childcare accounts, deferred compensation options, the reimbursement of itemized job-related expenses, pension contributions and accounts, and as solely relevant here, state-sponsored health care coverage paid for mostly by the State and partially by the participating members of the judiciary.

### III.

Turning attention more specifically to health care insurance contributions, authority is scant in New York and throughout the nation as to whether states' contributions toward the expense is protected by judicial Compensation Clauses. In New Jersey, where the Compensation Clause prohibits the diminution of judicial "salaries" during the terms of judicial

annual payments made by the State in lieu of itemized expenses (see People ex rel. Follett v Fitch, 145 NY at 266).

appointment (see NJ Const, art VI, § 6, para 6), the New Jersey Supreme Court held under facts similar to those present here that an increase in jurists' percentage contributions toward health care premiums, and toward pensions for that matter, was unconstitutional (see Depascals v State of New Jersey, 211 NJ 40, 62; accord Hudson v Johnstone, 660 P2d 1180, 1182 [unconstitutionality of Alaska's increase in judges' paycheck deduction toward the state's retirement system]; Stiftel v Varper, 378 A2d 124, 132, affd 384 A2d 2 [same, as to Delaware]). In contrast, the Court of Appeals of Michigan has held that a city's elimination of payments for judges' health care coverage and lesser fringe benefits did not violate that state's statutory judicial compensation protections (see Garian v City of Highland Park, 176 Mich App 379, 382). Michigan's non-diminution statute is similar to New Jersey's Compensation Clause in that its guarantees are directed at judicial "salaries," and not at "compensation" (see M.C.L. 600.8202[5]).

New York's Compensation Clause, unlike the language employed in New Jersey and Michigan, is not protective of "salaries," which is a narrow and targeted term, but of "compensation," which is broader and more inclusive. This Court used the terms "pay," "salary," and "compensation" interchangeably in Bockes, Gilbert, and/or Follett, but in those cases, it was not called upon to define any distinctions between the nomenclature, because doing so would have made no difference

to the narrow decisions the Court was called upon in those instances to render.

The interpretation of the "compensation" terminology used in the New York Constitution arose in a 2009 Appellate Division decision addressing the question of whether the elimination of paid health care benefits to a village justice during his term in office violated the State's Compensation Clause.  While not binding here, the Second Department held that the mid-term elimination of the justice's paid health benefits was an encroachment on the compensation protections afforded by article VI, § 25(a) of the New York Constitution (see Roe v Board of Trustees of the Vil. of Bellport, 65 AD3d 1211, 1212).  During the same year, the First Department viewed judicial "compensation [as] consisting of the pay scale *and benefits*" (Larabee v Governor of State of N.Y., 65 AD3d 74, 85 [emphasis added], affd as mod Maron v Silver, 14 NY3d 230, rearg denied, 16 NY3d 736).

Interestingly, the record evidences that New York State employees may opt out of the health care coverage offered by the State, and receive in exchange an "incentive payment" that is pro-rated in biweekly paychecks as taxable income (R 89, 109, 117).  If incentive payments are treated by the federal government as taxable income, the State's contributions toward the cost of the health care insurance coverage that is not waived by other employees should be construed as compensation as well.

Health care insurance coverage has been defined as part

of compensation, outside the scope of the Compensation Clause, in a variety of decisions from the Second, Third, and Fourth Departments, and in state and federal statutes.  The appellate decisions include, from the Fourth Department, <u>Matter of Board of Educ. of Dundee Cent. School Dist.</u> (96 AD3d 1536, 1539 ["a contribution toward an employee's health insurance is a form of compensation"]).  The Third Department has separately opined that "[i]t is generally undisputed that health insurance benefits are a form of compensation 'encompassed within the definition of terms and conditions of employment'" (<u>Matter of Police Assn. of City of Mount Vernon v New York State Pub. Empl. Relations Bd.</u>, 126 AD2d 824, 825, quoting <u>Matter of Town of Haverstraw v Newman</u>, 75 AD2d 874, 874-75).  Indeed, in <u>Matter of Town of Haverstraw</u>, the Second Department declared that "[t]here is no reason to distinguish legal insurance from health insurance or group life insurance.  All are a form of compensation and, as such, are encompassed within the definition of terms and conditions of employment" (<u>id.</u> at 874-75).

Likewise, Judiciary Law § 34, which apportions the cost of judicial remuneration between the State and counties, defines compensation as including "the employer's share of the premium for the coverage . . . under the health insurance plan created by article eleven of the civil service law."  Under New York Tax Law 24-a(b)(3), "a 'qualified production expenditure' means . . . all salaries, wages, fees and compensation including related

benefits."  A "living wage" under Administrative Code of the City of New York § 6-134(b)(9) is defined as "an hourly compensation package that is no less than the sum of the living wage rate and the health benefits supplement rate for each hour worked . . . The portion of the hourly compensation package consisting of the health benefits supplement rate may be provided in the form of cash wages, health benefits, or any combination of the two." Under a federal statute, the Board of the Tennessee Valley Authority must "approve all compensation (including salary or any other pay, bonuses, benefits, incentives, and any other form of remuneration) of all managers and technical personnel that report directly to the chief executive office" (16 USC § 831[a][g] [1][G]).  In another federal statute, the Senior Executive Service of United States "shall be administered so as to -- 1) provide for a compensation system, including salaries, benefits, and incentives, and for other conditions of employment, designed to attract and retain highly competent senior executives" (5 USC § 3131).  Title 5 of the United States Code, which sets forth federal employees' compensation rights, "govern[s] all incidents of employee compensation, including basic salaries; salary increases; overtime; holiday and sick pay; life and health insurance benefits; retirement benefits; travel and substance allowances; and compensation for injury and unemployment" (Kizas v Webster, 707 F2d 525, 536).

The State's contributions toward the health care

insurance premiums of judges and justices are not quantified in the record in actual dollars, but as percentages of the total costs only.  The State's contributions are likely the single largest emolument that the participating members of the judiciary receive beyond scheduled salaries themselves.  While the State's health care contribution may not approach, in relation to salary, the $6,000:$1,200 ratio that this Court protected as additional compensation in Bockes, it is undeniably significant given the high costs of health care premiums today.  We need not concern ourselves about whether the definition of compensation may or may not impact negligible issues such as parking privileges or cafeteria discounts.  Only the State's contributions toward health care insurance premiums are at issue here, the significance of which cannot reasonably be compared to the lesser job-related perquisites which are outside the scope of this appeal.

Notably, the precursors to the current New York Constitution broadly defined judicial remuneration as compensation rather than as salary, at a time when employer-provided health care insurance did not exist.  What did exist, as discussed in Bockes, were job-related out-of-pocket expenses that were initially reimbursed by the State on an itemized basis, then covered by an annual $1,200 "in lieu of" payment, and which later reverted to the itemized reimbursement practice that is in effect today.  Clearly, there has always been

an understanding, expectation, and practice that in one form or another, judicial compensation included reimbursements for expenses incurred on the job, even though no such entitlement is specifically referenced in any state constitution or amendment thereto.  Now, nearly two decades into the 21st century, the burgeoning cost of health care is undisputed.  The State now routinely offers employees health care policies and routinely makes contributions toward their costs, reflecting a new and additional understanding, expectation and practice.  These contributions, whether 90%, 88% or 84%, are significant for the employees who receive them and the employer who pays them, in both percentage and actual dollar terms.

When attorneys in private practice or employed in other capacities consider whether to seek a full-time judgeship by appointment or election, a prime consideration for many is the financial affordability of the career change.  In some instances, the new jurist will incur a reduction in annual compensation by choosing a career on the bench.  Similarly, current full-time judges and justices in New York assess their financial situations when deciding whether to seek re-appointment or re-election, or to choose higher remuneration in the private sector.  Still other members of the judiciary consider when and whether to retire from the bench, with or without the intention of remaining in the legal profession in some other form or fashion, and will factor into their calculation the financial impact of the decision.

Prospective, current, or retiring jurists examining the financial ramifications of these career decisions will logically and necessarily consider the total compensation package they would expect to receive during a term in office or in retirement. Health care expenses for the jurist, and for covered dependents in many instances, are a significant sum of money as they are to employees in any profession, and constitute an integral part of the calculation which must be made in deciding the affordability of entering, remaining in, or retiring from public service in the judiciary.

In sum, the State's contribution toward the health care insurance premiums of the participating members of the judiciary should be acknowledged as part of compensation within the protective cocoon of the Compensation Clause because, for reasons noted, doing so gives "practical effect" to the terms and wording of the Compensation Clause (see Ginsburg v Purcell, 51 NY2d at 276). It is a significant element of judicial remuneration and has been treated as such, as a practical matter, by both employer and employees, and in statutes and cases, no less so than the annual $1,200 "in lieu of" allowance that was protected by Bockes.

V.

The judgment appealed from should nevertheless be reversed.

Any direct reduction of compensation to members of the State judiciary violates New York's Constitution, article VI, § 25(a) (see Maron v Silver, 14 NY3d 230, 252-54).  At first blush, the State's reductions in health care insurance contributions embodied in Civil Service Law § 167(8) would appear to be violative of the Constitution and warrant judgment in plaintiffs' favor.

However, legislative enactments, such as Civil Service Law § 167(8), are presumed to be constitutional, and those who challenge them "bear a heavy burden of proving unconstitutionality beyond a reasonable doubt" (City of New York v State of New York, 76 NY2d 479, 485; see Elmwood-Utica Houses v Buffalo Sewer Auth., 65 NY2d 489, 495).  On this record, plaintiffs have failed to satisfy their burden that the reduction in the State's percentage contributions toward health care insurance premiums -- from 90% to 84% for active jurists and from 90% to 88% for retirees -- represents any net reduction of the value of the benefit to current and former members of the judicial branch.  Plaintiffs' claim is not that the State is paying less money per jurist overall, or less than it previously did for health care insurance premiums at the expense of individual members or retirees of the judiciary.  Rather, plaintiffs' claim is only that the State now contributes a lower percentage of those premiums.  The record is silent on whether the actual costs to the State have increased or decreased.  If,

for instance, the State's contributions toward health care insurance premiums increase in a relevant year by a dollar amount that exceeds the value of the State's 6% reduction in contributions for jurists or the 2% reduction for retirees, the judiciary, rather than suffering a diminution of overall compensation, may arguably come out "ahead" in the equation.  In other words, the 6% or 2% contribution reductions toward premiums, as authorized by Civil Service Law § 167(8), do not necessarily and mathematically reduce the value of the insurance payments provided by the State, like a see-saw, without additional evidence that insurance payments by the State have not independently risen by 6% or 2% or more, if at all.  Absent a mathematical showing by plaintiffs that the State's health care contributions, protected by the Compensation Clause, have been reduced in dollar terms for the insurance products provided, rather than in percentage terms, plaintiffs fail, as constrained by their allegations, to satisfy their burden of proof.

The record evidence also fails to address qualitative differences that may exist in State-sponsored health care insurance coverage from year to year.  If, for instance, current or former members of the judiciary pay an additional percentage for their coverage, but the quality of that coverage improves by some measurement by the same or greater percentage, it cannot be said that their compensation has been diminished, because the additional expenditure merely purchases an improved health care

product to the same degree.  This Court does not know whether the percentage reduction in the State's contributions has been accompanied by any increase or decrease in the quality of coverage, because plaintiffs have failed to address their burden of proof on the issue.

The foregoing is consistent with Maron v Silver (14 NY3d at 254), wherein we held that the Compensation Clause is not violated if inflation erodes the value of compensation.  Absent a showing that the State's health care contributions have lessened because of the 6% or 2% reductions at issue here, or proof that the substance of the insurance has meaningfully decreased, plaintiffs fail to meet their burden of overcoming the presumption of constitutionality that is attached to Civil Service Law § 167(8).

By concluding that a direct diminution of judicial salary has not been mathematically established, in dollar terms, we do not reach the secondary question of whether the State's reduced percentage contributions toward health care premiums for the judiciary and its retirees was accomplished in a discriminatory or non-discriminatory manner as compared with other employees of the State (see United States v Hatter, 532 US 551, 571).

Accordingly, the judgment should be reversed without prejudice to plaintiffs recommencing a new action, if they be so advised.

Bransten v State of New York

No. 67

WILSON, J.(concurring):

I agree with Justice Dillon that health care benefits are "compensation." I write separately because this appeal fails for a simple reason or, if not, should not be here at all.

Plaintiffs sought a declaration that Civil Service Law § 168 (8) is unconstitutional. Their complaint does not seek a declaration that the regulations subsequently promulgated thereunder are unconstitutional. In moving for summary judgment, plaintiffs reiterated their request for a declaration that the statute was unconstitutional; they did not assert that the regulations were. However, the statute says only this: "The president, with the approval of the director of the budget, may extend the modified state cost of premium or subscription charges for employees or retirees not subject to an agreement referenced above and shall promulgate the necessary rules or regulations to implement this provision" (Civil Service Law § 168 [8]). It does not require any change or reduction, or any action at all. Civil Service Law § 168 (8) itself is decidedly constitutional.

The fact that the plaintiffs here are Supreme Court Justices should not entitle them to any laxer pleading standard than we afford other litigants. They did not seek a declaration

- 1 -

that the regulations were unconstitutional, did not amend their complaint, and did not move to conform the pleadings to the proof. I would reverse on the ground that the statute itself does not affect compensation however compensation is defined, and strike the balance of Supreme Court's order because plaintiffs did not seek any declaration as to the regulations.

If, for some reason, my simple analysis above is wrong, then we lack jurisdiction to hear the appeal. The alleged diminution in compensation arises not from the statute, but from the subsequent regulations, at 4 NYCRR 73.3 (b) and 73.12. Jurisdiction was asserted under CPLR 5601 (b) (2), which permits a direct appeal to the Court of Appeals from Supreme Court "where the only question involved on the appeal is the validity of a statutory provision of the state or of the United States."

In similar circumstances, we have disallowed a direct appeal when plaintiffs sought to challenge the constitutionality of regulations (Rent Stabilization Ass'n v Higgins, 83 NY2d 156, 168 [1993] ["appellants sought a direct appeal to this Court, which we transferred to the Appellate Division on the ground that questions other than the constitutional validity of a statute were involved"]).

It is unclear why we have permitted a direct appeal from Supreme Court here, and passed on the constitutionality of the regulations. Whatever the reason, our decision today creates an amorphous jurisdictional portal, which may open for others in

the future.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Judgment reversed, without costs, plaintiffs' motion for summary judgment denied, and judgment granted in favor of defendant declaring Civil Service Law § 167(8) does not violate the Compensation Clause of the New York State Constitution (NY Const, art VI, § 25[a]).  Opinion Per Curiam.  Judges Rivera, Fahey, Garcia, Peradotto and Mulvey concur.  Judge Dillon concurs in result in an opinion, in which Judge Wilson concurs in a separate opinion.  Chief Judge DiFiore and Judges Stein and Feinman took no part.

Decided November 21, 2017